Mary Louise SOENTGEN, Plaintiff
and Appellant,

v.

QUAIN & RAMSTAD CLINIC, P.C., Med-
center One, Inc., a corporation, Ter-
rance G. Brosseau, individually and as
an agent of Medcenter One, Defendants
and Appellees.

Civ. No. 900170.

Supreme Court of North Dakota.

Feb. 21, 1991.

74

William C. Severin (argued), of Severin & Ringsak, Bismarck, for plaintiff and appellant.

Lyle W. Kirmis (argued) and Kathleen K. Davison (appearance), of Zuger, Kirmis, Bolinske & Smith, Bismarck, for defendant and appellee Quain & Ramstad Clinic.

Timothy D. Lervick (argued), of Rolfson Schulz Lervick Law Offices, Bismarck, for defendants and appellees Medcenter One and Terrance G. Brosseau.

MESCHKE, Justice.

Mary Louise Soentgen appealed from a summary judgment dismissing her suit for defamation and wrongful discharge against Quain & Ramstad Clinic (Q & R), Medcenter One, and Terrance G. Brosseau, individually and as an agent of Medcenter One, and awarding attorney's fees to the defen-

dants. We affirm the summary judgment and reverse the attorney's fees.

Q & R hired Soentgen as a neonatologist in 1982. In 1984, Q & R and Soentgen executed a written employment contract for a five-year term from September 1, 1984 through August 31, 1989. The contract said that Q & R could terminate Soentgen's employment "at any time within 120 days notice with cause." Because neonatology is a hospital-based specialty, Soentgen performed the Q & R contract at Medcenter, where she was granted partial staff privileges in the obstetrical department, and full staff privileges in the pediatric, pediatric ICU, and neonatology departments.

In 1986 the Medcenter nursing staff reported concerns about Soentgen's patient care. Those concerns were forwarded to Brosseau, the President and Chief Executive Officer of Medcenter, and he advised the nursing staff to continue to monitor Soentgen's patient care. At Medcenter's request, Carlos Ahumada, a board certified neonatologist at the Fargo Clinic, reviewed and evaluated records for some of Soentgen's patients. Ahumada opined that Soentgen needed more medical education in intubation, ventilation, and nutrition management. Brosseau also received added reports from the nursing staff that Soentgen had reported for work with alcohol on her breath and slurred speech on April 3 and on the morning of April 7, 1987.

On the afternoon of April 7, 1987, Brosseau and Everett Colbert, the administrator of Q & R, met with Soentgen. According to Brosseau, he and Colbert mutually decided to offer Soentgen a voluntary leave of absence for four to six weeks and to request that she obtain continuing medical education during that time. According to Soentgen,

she was summoned to the office of Terry Brosseau, where, in the presence of Ev Colbert, the Executive Officer of Q & R Clinic, her employer, she was accused of being alcoholic or drug addicted, that she did not have the care and concern for her patients as she previously had, was told that Dr. Kotrapu or Dr. Grassy had agreed to take her patients, and that she was told that she was required to take a four to six weeks' leave starting immediately, that it was mandatory, and that if she did not do so, Brosseau would take action legally to have her removed.

Soentgen testified in her deposition that she believed the focus of the meeting was about drug and alcohol abuse:

Terry walked in, and Mr. Brosseau was the first one to say anything, and he said, "What I have to talk to you about is not pleasant." He sat down and he asked me if I was on drugs and/or alcohol, that he had had complaints about me, that I had been accused of being on drugs and alcohol, the nurses informed him that I was not accessible, I was less accessible not only for the babies but to them, my personality had changed, my disposition had changed, my gait was not correct, my speech had changed, they had trouble waking me at night, the nurses had told him that my housekeeper told them she was having trouble getting me awake, that the phone would ring as much as 15 times and there would be no answer, and that my care of the infants was not as good anymore, I wasn't as concerned about them, that I had to leave that day, take a vacation or a mandatory leave of absence, and if I didn't do it that day he would do something legally.

Later in April 1987, Medcenter and Q & R both sent Soentgen letters by certified mail inquiring about her plans for training in intubation, ventilation, and nutrition management.

On May 5, 1987, Soentgen's attorney wrote Colbert and Brosseau for an explanation of Soentgen's current and future status. On May 11, 1987, Soentgen and her attorney met with Brosseau and Colbert to discuss the circumstances of the April 7 meeting. Thereafter, Soentgen did not take any steps to secure additional training or continuing education, and she did not contact the defendants about returning to work or take any internal administrative steps to contest the defendants' actions. On June 30, 1987, she sued Q & R, Medcen-

ter, and Brosseau, alleging defamation, wrongful discharge, interference with contract, discrimination, and violation of her constitutional rights.

On July 29, 1987, Q & R notified Soentgen that a hearing would be held on August 12, 1987, to determine whether or not cause existed to terminate her contract with Q & R. After the hearing, Q & R terminated Soentgen's contract, concluding that her job performance and competency were inadequate based on clinic standards for intubation, ventilation, and nutrition management, and that her job performance, competency, and physical condition were inadequate on two occasions during the first week of April 1987. By letter dated August 14, 1987, Colbert notified Soentgen that her contract with Q & R would be terminated in 120 days and that Q & R would continue to pay her salary until then. Q & R paid her salary until December 16, 1987.

The defendants moved for summary judgment in Soentgen's lawsuit. Soentgen voluntarily dismissed her claim for violation of her constitutional rights. The trial court granted summary judgment dismissing Soentgen's remaining claims. Pursuant to NDCC 28–26–01(2), the trial court also awarded attorney's fees of $12,722.41 to Q & R and of $9,830.20 to Medcenter and Brosseau. Soentgen appealed.

We use standards applicable to summary judgment in our review. In *Eckmann v. Northwestern Federal Savings & Loan Association*, 436 N.W.2d 258, 260 (N.D.1989), we recently outlined these standards:

Summary judgment under Rule 56, N.D.R.Civ.P., is a procedural device available for the prompt and expeditious disposition of cases without trial when, after viewing the evidence in a light most favorable to the opposing party and giv-

ing that party the benefit of all inferences, there is no genuine dispute as to either the material facts or the inferences to be drawn from undisputed facts.... Although the party seeking summary judgment has the burden of showing that there is no genuine issue of material fact, the party resisting the motion may not simply rely upon his pleadings but must present competent evidence by affidavit or other comparable means which raises an issue of material fact.... The plain language of Rule 56 requires the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of a factual dispute as to an essential element of his claim and on which he will bear the burden of proof at trial.... When no pertinent evidence on an essential element is presented to the trial court in resistance to the motion for summary judgment, it is presumed that no such evidence exists. [Citations omitted.]

On appeal from a summary judgment, we view the evidence in the light most favorable to the party against whom summary judgment was granted, and we give that party the benefit of all favorable inferences that can be reasonably drawn from the evidence. *Matter of Estate of Herr*, 460 N.W.2d 699 (N.D.1990). We examine Soentgen's claims within that framework.

## DEFAMATION

Soentgen argues that, at the April 7 meeting with Brosseau and Colbert, she was slandered[1] by statements that "she had slurred speech at night; her gait had changed; her eyes were blood shot; she was hard to wake; she didn't care for patients; and her abilities were poor." She argues that summary judgment on her defamation claims was improper because the

1. Soentgen's defamation claims are made under NDCC 14–02–04(3):

"*Civil slander" defined.* Slander is a false and unprivileged publication other than libel, which:

\* \* \* \* \* \*

3. Tends directly to injure him in respect to his office, profession, trade, or business, ei-

ther by imputing to him general disqualifications in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits.

trial court made factual findings in favor of the defendants and against her.

The trial court determined that Q & R's agent, Colbert, did not make any false statements at the April 7 meeting and therefore Q & R did not defame Soentgen. The trial court also viewed Brosseau's statements as a recitation of complaints by Medcenter's nursing staff that were not false, were not published to a person who understood them to be false, and were privileged. The trial court concluded that when Soentgen agreed to abide by Medcenter's bylaws she consented to the statements for the efficient administration of the hospital.

It is well established that there is no liability for defamatory statements that are privileged. NDCC 14–02–03; 14–02–04(3); e.g., *Emo v. Milbank Mutual Ins. Co.*, 183 N.W.2d 508 (N.D.1971); *Stafney v. Standard Oil Co.*, 71 N.D. 170, 299 N.W. 582 (1941). Privilege is based upon the sound public policy that some communications are so socially important that the full and unrestricted exchange of information requires some latitude for mistake. Prosser & Keeton on Torts (5th Ed.) 1984 §§ 114, 115; Restatement (2nd) of Torts, Conditional Privileges, pp. 242–43, 258; 50 Am.Jur.2d, Libel and Slander, § 195 (1970). The existence of privilege disposes of Soentgen's defamation claims.

■ Privilege is either absolute or qualified. *Farmers Educational & Cooperative Union of America v. WDAY, Inc.*, 89 N.W.2d 102 (N.D.1958), aff'd 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959); see Prosser & Keeton on Torts at §§ 114, 115. Absolute privilege is limited to situations in which the free exchange of information is so important that even defamatory statements made with actual malice are privileged. NDCC 14–02–05(1) and (2); *WDAY.* In contrast, a qualified privilege may be abused and does not provide absolute immunity from liability for defamation. NDCC 14–02–05(3) and (4); *WDAY.* In this case the defendants rely upon a qualified privilege.

NDCC 14–02–05(3) says:

*Privileged communications.* A privileged communication is one made:

\* \* \* \* \* \*

3. In a communication, without malice, to a person interested therein by one who also is interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information;

This statutory qualified privilege parallels the privilege expressed in Medcenter's bylaws which Soentgen agreed to be bound by:

[T]hat any act, communication, report, recommendation, or disclosure, with respect to any such practitioner, performed or made in good faith and without malice and at the request of an authorized representative of this or any other health care facility, for the purpose of achieving and maintaining quality patient care in this or any other health care facility, shall be privileged to the fullest extent permitted by law.

These delineations of qualified privilege guide our analysis.

■ An analysis of qualified privilege requires a two-step process to determine (1) if the attending circumstances of a communication occasion a qualified privilege, and (2) if so, whether the privilege was abused. Prosser & Keeton on Torts at § 115. Where the circumstances of the occasion for a communication are not in dispute, the determination of whether there is a qualified privilege is a question of law for the court. *Stafney v. Standard Oil Co.;* Prosser & Keeton on Torts at § 115; Restatement (2nd) of Torts at § 619(1). Whether a qualified privilege is abused is generally a question of fact. Prosser & Keeton on Torts at § 115; 50 Am.Jur.2d, Libel and Slander at § 288; Restatement (2nd) of Torts at § 619(2). We conclude that there was a qualified privilege without any reasonable inferences of abuse.

■ In analyzing whether statements between Brosseau, Colbert, and Soentgen

at the April 7 meeting were an occasion of a qualified privilege, we start with the premise that generally communications by an employer concerning the conduct of an employee are, when necessary to protect interests of the employer, qualifiedly privileged. 50 Am.Jur.2d, Libel and Slander at § 271; Restatement (2nd) Torts at § 596, comment b. That is especially true where the employer is a hospital because a hospital has a duty to provide the public with competent physicians. *See Benedict v. St. Luke's Hospitals,* 365 N.W.2d 499 (N.D. 1985); Annot., Hospital's Liability for Negligence in Selection or Appointment of Staff Physician or Surgeon, 51 A.L.R.3d 981 (1973). A hospital's proper investigation of complaints about its physicians is necessary to ensure that its physicians are competent, and the hospital's failure to investigate complaints could expose it to liability. *Benedict v. St. Luke's Hospitals.* The occasion for communications involving a hospital's investigation of its physicians' competency is a subject matter about which both the maker and receiver have a common interest, and a discussion of complaints with the physician is relevant to that common interest.

▇ The existence of a qualified privilege in investigations of physicians embodies the important public policy of protecting the welfare of patients by assuring the free exchange of information. *See Sibley v. Lutheran Hospital of Maryland, Inc.,* 709 F.Supp. 657 (D.C.Md.), *aff'd. in* 871 F.2d 479 (4th Cir.1989); *De Leon v. St. Joseph Hospital, Inc.,* 871 F.2d 1229 (4th Cir.1989). Although Soentgen contends that she was competent and was not an alcoholic or drug addict, she does not dispute that Brosseau received complaints about her in these areas. Brosseau and Colbert had a common interest in ensuring that Soentgen was competent and in relaying their concerns to Soentgen at the April 7 meeting. We hold that, as a matter of law, the statements at the April 7 meeting were the occasion of a qualified privilege.

▇ We turn to whether the defendants abused the qualified privilege. A qualified privilege is abused if statements are made with actual malice, without reasonable grounds for believing them to be true, and on a subject matter irrelevant to the common interest or duty. *Emo; WDAY.* The plaintiff must prove actual malice and abuse of the privilege. Prosser & Keeton on Torts at § 115; 50 Am.Jur.2d, Libel and Slander at § 452. Soentgen did not submit facts that would permit those inferences.

▇ Actual malice is required in order to defeat a qualified privilege. *WDAY; Haldeman v. Total Petroleum, Inc.,* 376 N.W.2d 98 (Ia.1985); *Frankson v. Design Space International,* 394 N.W.2d 140 (Minn.1986). *See also* 50 Am.Jur.2d, Libel and Slander at § 199; Prosser & Keeton on Torts at § 115; Restatement (2nd) Torts at § 600. Actual malice depends on scienter and requires proof that a statement was made with malice in fact, ill-will, or wrongful motive. *Sibley; De Leon; Haldeman; Frankson.* If the occasion is one of qualified privilege, actual malice is not inferred from the communication or publication even if statements are slander per se. *WDAY;* NDCC 14-02-05. Soentgen submitted little evidence besides the communication itself.

▇ Generally, actual malice and abuse of a qualified privilege are questions of fact. Prosser & Keeton on Torts at § 115; Restatement (2nd) Torts at § 619(2); 50 Am.Jur.2d, Libel and Slander at § 288. However, where the facts and inferences are such that reasonable minds could not differ, factual issues are questions of law. *Kirton v. Williams Electric Co-op., Inc.,* 265 N.W.2d 702 (N.D.1978). We believe that is true here.

Soentgen argues that there are disputed factual issues about whether the qualified privilege was abused because the defendants did not comply with their bylaws in taking action against her. She asserts that a jury could infer malice and bad faith from the defendants' actions in having a non-staff, non-peer review committee physician review medical records of her patients. She also contends that a jury could find the defendants' statements about alcoholism and her competency were reckless and

abused their privilege. We are not persuaded that the inferences from those facts are such that reasonable minds could conclude that the qualified privilege was abused.

Although the Hospital bylaws do not specifically contemplate an independent evaluation of a physician's competency, compliance with the bylaws is not necessarily synonymous with the exercise of the qualified privilege. The independent review of the medical records of Soentgen's patients indicates an effort to evaluate, that is, substantiate or disprove, the nursing staff's concerns about Soentgen's competency. Such an effort is relevant to the important public policy of protecting the welfare of patients. The results of that evaluation and the nursing staff's complaints gave the defendants reasonable grounds for believing their statements at the April 7 meeting were true. Medcenter's informal effort to substantiate the allegations against Soentgen is consonant with a hospital's duty to exercise reasonable care in staffing. *Benedict v. St. Luke's Hospitals;* Annot., 51 A.L.R.3d 981. That positive effort does not support a negative inference of actual malice or abuse of the qualified privilege.

Moreover, Soentgen, Colbert, and Brosseau were the only people at the April 7 meeting. Soentgen does not dispute that Brosseau had received complaints that, on

two occasions, she had slurred speech and alcohol on her breath when she reported for work. Soentgen also does not dispute that Brosseau had received complaints from Medcenter's nursing staff about her competency and that he had had an independent neonatologist evaluate those complaints. The alleged defamatory statements relied upon by Soentgen were relevant to a physician's competency, and all of the people at the April 7 meeting had a direct interest in those statements and Soentgen's competency. The content of the statements does not support an inference that those statements were made with malice in fact, ill-will, or a wrongful motive. Soentgen has presented no other evidence to support an inference of actual malice or abuse of the qualified privilege.

Viewing the evidence in the light most favorable to Soentgen, we are not persuaded that she has raised a genuine issue of material fact about whether the defendants made statements at the April 7 meeting with actual malice or outside the scope of their qualified privilege. We hold, as a matter of law, that the statements at that meeting were privileged and that summary judgment was proper on those claims.

■ Soentgen also asserts that Colbert made additional defamatory statements after the April 7 meeting.[2] However, Soent-

2. In her appellate brief to this court, Soentgen relies on her answers to Q & R's interrogatories to support her assertion that Colbert made defamatory statements after the April 7 meeting:

Dr. Marlin Johnson called to tell plaintiff he had been talking to Ev, and wanted to meet with her to discuss the situation and medical problems and background. That was on April 13, 1987. On April 15, 1987, Dr. Eberhart made the statement that he was sorry he hadn't been there for plaintiff, since she had been there for him. Dr. Gene Balzer asked how plaintiff was doing at Heartview, and indicated that he had heard about it that night, April 7, 1987. Apparently Trish, Ev Colbert's girlfriend, had made the statement to him.

On April 27, 1987, Dr. Young called plaintiff and told her that he had heard that she had problems, and Ev Colbert told him about the problem. Dr. Young also said that Ev had announced her drug and alcohol problem at a chairman's meeting at Q & R. Ev apparently also told him in the meeting that Terry had

summoned plaintiff and told her that she had to leave or he would do something. Dr. Young indicated that Ev Colbert said plaintiff would go for treatment.

On May 15, 1987, Dr. Townes told his wife that Q & R had fired plaintiff. Mrs. Townes called and told plaintiff. Dr. Young and his wife were at plaintiff's home and indicated they had been talking to Ev Colbert and would like to know how plaintiff was doing and how long she had been at Heartview.

Ev Colbert told plaintiff that he had talked to Dr. Kotrapu and Dr. Grassy prior to the April 7, 1987 meeting, and that those doctors had agreed to cover for her. Plaintiff saw Dr. Kotrapu later during lunch, and Dr. Kotrapu told her that Ev Colbert had talked to him about plaintiff's problems, and that he (Dr. Kotrapu), was so sorry, and that he would talk to her at some time about the problems.

\* \* \* \* \* \*

In addition to the above, plaintiff had been stopped on the street and elsewhere by many people who had heard rumors that she was

gen has not presented any competent admissible evidence of those statements. A party opposing a motion for summary judgment must present competent admissible evidence to raise a genuine issue of material fact. *Northern Trust Co. v. Buckeye Petroleum Co.*, 389 N.W.2d 616 (N.D.1986). The statements relied upon by Soentgen are inadmissible hearsay, and she did not present affidavits or deposition testimony by any of the individuals who heard Colbert's alleged statements. The trial court offered Soentgen the opportunity to submit additional affidavits, but she informed the court that she had nothing further to submit. Under those circumstances, we conclude that the trial court properly granted summary judgment on Soentgen's defamation claims.

### DISCRIMINATION

■ Soentgen argues that summary judgment was improper on her claim for discrimination under NDCC Ch. 14–02.4. She asserts that alcoholism and drug addiction are handicaps under that law and that the defendants treated her differently than other physicians with the same handicap. She contends that the different treatment included requiring only her to get continuing medical education despite Dr. Ahumada's report that two other physicians needed additional training, too.

NDCC 14–02.4–03 says

It is a discriminatory practice for an employer ... to discharge an employee; or to accord adverse or unequal treatment to a person or employee with respect to application, hiring, training, apprenticeship, tenure, promotion, upgrading, compensation, layoff, or a term, privilege, or condition of employment, because of ... physical or mental handicap, ...

NDCC 14–02.4–08 says

Notwithstanding sections 14–02.4–03 through 14–02.4–06, it is not a discriminatory practice for an employer ... to discharge an individual from a position ... on the basis of ... physical or mental handicap ... in those circumstances

where ... physical or mental handicap ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

Assuming arguendo that alcoholism and drug addiction are handicaps under that act and that the defendants' actions against her were because of those handicaps, we agree with the trial court that, as a matter of law, Soentgen was not the victim of a discriminatory practice because the defendants' actions were based on "a bona fide occupational qualification reasonably necessary" for a physician. The trial court properly granted summary judgment on this claim.

### WRONGFUL DISCHARGE

■ Soentgen contends that she reasonably believed her staff privileges at Medcenter were actually or constructively suspended on April 7, 1987. She asserts that her staff privileges were controlled by Medcenter's bylaws as a contract between her and the hospital, and that Medcenter breached that contract by failing to follow its bylaws. We disagree.

When Soentgen applied for staff privileges at Medcenter, she agreed to be bound by the hospital's bylaws. Section II(A) of Medcenter's bylaws says

whenever the action must be taken immediately, in the best interest of patients care in the medical center, [the chief executive officer may] summarily suspend all or any portion of the clinical privileges of a practitioner, and such summary suspension shall become effective immediately upon imposition. The cause shall be written. The written cause shall be presented to the affected practitioner and the executive committee within 24 hours of the suspension.

Section II(B) of the bylaws requires a practitioner whose clinical privileges have been summarily suspended to request that the executive committee of the medical staff hold a hearing on the matter within a rea-

---

either in Heartview or otherwise being cared for. Other people contacted friends of plain-

tiff and asked them about her alleged problems.

sonable time. Sections II(A) and (B) require "written cause" to be presented to the practitioner within twenty-four hours of the suspension and then place the burden on the practitioner to request a hearing on the matter.

It is widely held that a physician is required to exhaust all available internal remedies provided by a hospital before instituting a judicial action for damages arising from exclusion or expulsion. *Eidelson v. Archer*, 645 P.2d 171 (Alaska 1982); *Garrow v. Elizabeth General Hospital and Dispensary*, 79 N.J. 549, 401 A.2d 533 (1979); *Westlake Community Hospital v. Superior Court of Los Angeles County*, 17 Cal.3d 465, 131 Cal.Rptr. 90, 551 P.2d 410 (1976). We apply the reasoning of these precedents to this case.

In *Westlake*, 131 Cal.Rptr. at 96, 551 P.2d at 416, the court explained the rationale for exhausting internal remedies before seeking damages:

> [E]ven if a plaintiff no longer wishes to be either reinstated or admitted to the organization, an exhaustion of remedies requirement serves the salutary function of eliminating or mitigating damages. If an organization is given the opportunity quickly to determine through the operation of its internal procedures that it has committed error, it may be able to minimize, and sometimes eliminate, any monetary injury to the plaintiff by immediately reversing its initial decision and affording the aggrieved party all membership rights; an individual should not be permitted to increase damages by foregoing available internal remedies....

> Moreover, by insisting upon exhaustion even in these circumstances, courts accord recognition to the "expertise" of the organization's quasi-judicial tribunal, permitting it to adjudicate the merits of the plaintiff's claim in the first instance.... Finally, even if the absence of an internal damage remedy makes ultimate resort to the courts inevitable ... the prior administrative proceeding will still promote judicial efficiency by unearthing the relevant evidence and by providing a record which the court may review.

Similarly in *Garrow v. Elizabeth General Hospital and Dispensary*, 401 A.2d at 538, the court said:

> The reasons for the [exhaustion of internal remedies] rule relate with like force to hospital proceedings. If the complaining party prevails before the administrative agency or the hospital board, judicial proceedings would have been unnecessary and the court would have intervened needlessly.... A hospital board presumably has expertise in certain areas, particularly in determining a physician's qualifications in relation to a hospital's facilities, needs and personnel. The medical staff is in a position to review credentials and evaluate competency and effectiveness. This special knowledge is available to the board of trustees whose decisions could have a substantial impact on the quality of care to be provided.

> \*　　\*　　\*　　\*　　\*　　\*

> Furthermore, it is preferable to decide issues after factual disputes have been resolved by the fact-finding body and not in a vacuum. Often the issues will become more limited and sharpened when the facts have been delineated. These results will generally be embodied in the factual findings of the agency or the hospital at the conclusion of the proceedings.

Viewing the evidence in the light most favorable to Soentgen, we agree with her that she could have reasonably believed that Medcenter summarily suspended her staff privileges on April 7 when she was told to take "six weeks' leave starting immediately." However, Soentgen admits in her deposition that at the April 7 meeting she received copies of Dr. Ahumada's written reports which indicated inadequacies in intubation, ventilation, and nutrition management. Those written reports effectively complied with Medcenter's requirement to provide "written cause" to the affected practitioner for a summary suspension. *Stensrud v. Mayville State Col-*

*lege,* 368 N.W.2d 519 (N.D.1985). Medcenter followed its bylaws.

 Under Section II(B) of the bylaws, Soentgen then had the obligation to request a hearing. However, she did not request a hearing, and on April 27, 1987, Brosseau wrote a letter to her about his concerns that she remain current with technology in intubation, ventilation, and nutrition management. On May 11, 1987, Brosseau, Colbert, Soentgen, and her attorney met to discuss Soentgen's "current and future status." Thereafter, Soentgen still did not request a hearing on the action against her. She did not exhaust her internal administrative remedies, and, instead, she sued.

Although Soentgen claims that alcohol and drug addiction were the focus of the April 7 meeting, there is no indication that Soentgen could not have raised those issues if she had requested a hearing under Medcenter's internal procedures. The resolution of those types of issues is the reason for the exhaustion of remedies doctrine. We hold that the trial court properly granted summary judgment on Soentgen's wrongful discharge claim against Medcenter because Medcenter provided Soentgen with "written cause" of the reasons for her summary suspension and she thereafter failed to exhaust her internal remedies.

 Soentgen contends that the trial court erred in granting summary judgment on her breach of contract claim against Q & R because Q & R constructively discharged her on April 7, 1987, without a determination that cause existed. She argues that Q & R had no bylaws, rules, regulations, or defined administrative procedure for determining cause and asserts that there are factual issues about when she was terminated. Soentgen's argument is based upon "Colbert's tacit cooperation, if not agreement, with Brosseau in suspending her immediately without a cause hearing, having another physician previously lined up to take her patients, Soentgen's signing all of her patients over to that new doctor immediately, and the belief she had been fired."

 A constructive discharge occurs when an employer deliberately makes or allows an employee's working conditions to become so intolerable that the employee has no other choice but to quit. For example, *see Irving v. Dubuque Packing Co.,* 689 F.2d 170 (10th Cir.1982). A party seeking to recover on a claim of constructive discharge must show that a reasonable person in that party's position would not have returned to work. *Reihmann v. Foerstner,* 375 N.W.2d 677 (Ia.1985). The focus is not how the plaintiff felt but whether a reasonable person in that position would not have returned to work.

Soentgen's deposition, affidavit, and notes regarding the April 7 meeting consistently indicated that she was asked to take a four to six week leave or vacation and that she was told to obtain additional medical training. Additional medical training is consistent with the purpose of Q & R's contract with Soentgen to maintain "the standards of professional conduct and service heretofore respected." Soentgen admitted that she was not told that she was terminated at the April 7 meeting.

Although Soentgen may have reasonably believed that her staff privileges at Medcenter were suspended on April 7, we are not persuaded that, viewing the evidence in the light most favorable to her, the facts support an inference that she was constructively discharged at the April 7 meeting. Any subjective belief that Soentgen may have had about her status after the April 7 meeting was the product of her failure to exhaust her internal administrative remedies.

Moreover, she still did not request a hearing after the subsequent letter from Colbert inquiring about her plans to acquire state-of-the-art training nor did she do so after the May 11 meeting about her current and future status. This is not a case where an employer made working conditions so bad the employee was forced into an involuntary resignation. *See Reihmann v. Foerstner.* Because of Soentgen's failure to exhaust her internal remedies, we do not believe that she has raised a genuine issue of material fact that a

reasonable person in her position would be justified in not returning to work.

. ▉ Soentgen also contends that there are factual issues about whether Q & R had cause to terminate her after the August 12 hearing. Other courts have recognized that the evaluation of medical qualifications of physicians is a factual determination properly committed to the expert judgment of medical authorities and is subject to only limited judicial scrutiny. *Eidelson v. Archer; Garrow v. Elizabeth General Hospital. See also* Perrot, *Employee Dismissal Law and Practice*, §§ 4.24, 7.26 (1987). In *Garrow,* the court said that a hospital's administrative record should contain sufficient reliable evidence to justify the hospital's action. That view parallels our limited review of disciplinary actions by municipal employers where a court only reviews the evidence to determine whether there was any legal and substantial basis for the disciplinary action. *Rudnick v. City of Jamestown,* 463 N.W.2d 632 (N.D. 1990). Similar considerations guide our review here.

▉ Although Q & R may not have had bylaws requiring a cause hearing, it gave her such a hearing on August 12, 1987, and there determined that cause existed to terminate her employment. At that hearing, Q & R presented evidence that Soentgen's job performance and competency were inadequate with respect to intubation, ventilation, and nutrition management. Although her attorney participated in that hearing, Soentgen did not personally appear at that hearing to explain her actions, nor did she present any expert evidence to rebut Q & R's evidence. Neither did Soentgen present any expert evidence in the trial court to rebut Q & R's evidence. Generally, expert evidence is necessary to rebut charges about a professional's level of competence. *See Wastvedt v. Vaaler,* 430 N.W.2d 561 (N.D.1988). Under these circumstances we conclude that the trial court properly granted summary judgment on this claim.

## INTERFERENCE WITH CONTRACT

▉ Soentgen also claims that Medcenter improperly interfered with her contract with Q & R, proximately causing its breach. In order to prevail on this claim, Soentgen must show that Q & R breached its contract with her. *Bismarck Realty Co. v. Folden,* 354 N.W.2d 636 (N.D.1984). Because Q & R did not breach its contract with Soentgen, the trial court properly granted summary judgment on this claim.

## ATTORNEY'S FEES

▉ The trial court awarded attorney's fees under NDCC 28–26–01(2):

In civil actions the court shall, upon a finding that a claim for relief was frivolous, award reasonable actual and statutory costs including reasonable attorney's fees to the prevailing party. Such costs must be awarded regardless of the good faith of the attorney or party making the claim for relief if there is such a complete absence of actual facts or law that a reasonable person could not have thought a court would render judgment in their favor, providing the prevailing party has in responsive pleading alleged the frivolous nature of the claim. This subsection does not require the award of costs or fees against an attorney or party advancing a claim unwarranted under existing law, if it is supported by a good faith argument for an extension, modification, or reversal of the existing law.

If attorney's fees are requested under that statute, the trial court must first determine whether a claim is frivolous. If the court makes that determination, the court must then award reasonable attorney's fees to the prevailing party.

▉ In *Larson v. Baer,* 418 N.W.2d 282 (N.D.1988), we said that a claim is frivolous when there is a complete absence of actual facts or law so that a reasonable person could not have expected that a court would render a judgment in that party's favor. Authorizations of attorney's fees for frivolous claims are not meant to chill enthusiasm and creativity in pursuing factual or legal theories, and a court should not use the wisdom of hindsight to deter-

mine whether claims are frivolous. *Napoleon Livestock Auction, Inc. v. Rohrich*, 406 N.W.2d 346 (N.D.1987); F.R.Civ.P. 11, 1983 Advisory Committee Notes.[3] If the law is unclear or unsettled on a particular claim, that circumstance makes it more likely that a party might reasonably expect to prevail on that claim. *Larson v. Baer.* Affirmance of a summary judgment on appeal does not mean that a claim was frivolous. *Id.* That is true here.

The trial court concluded that all the claims against Q & R demonstrated a "complete absence of actual facts and law that a reasonable person could not have thought a court would render judgment in her favor" and awarded Q & R $12,722.41 in attorney's fees. The court also concluded that only the discrimination, violation of constitutional rights, and interference with contract claims against Medcenter and Brosseau were frivolous and awarded them $9,830.20 in attorney's fees. In deciding on the awards the trial court explained:

> One final comment on this motion prompts me to point out the unreasonable attitude of plaintiff subsequent to her first conversation with Brosseau and Colbert. She made no response to that and subsequent communication. They raised a valid concern about her medical practice based on bona fide reports and investigation. Her sole response was a lawsuit which for the most part was groundless and retaliatory. These actions furnish the reason for the enactment and enforcement of 28–26–01.

Soentgen's defamation claim against Q & R was based upon statements allegedly made about her competency and alcoholism or drug addiction. That claim raised difficult issues about abuse of a qualified privilege which usually turn on factual determinations. Although we have concluded that Soentgen failed to raise genuine issues of material fact about abuse of a qualified privilege in this case, our conclusion does not mean that her claim had such a complete absence of facts and law that she could not have reasonably expected a favorable judgment. *Larson v. Baer.* We conclude that the trial court abused its discretion in allowing attorney's fees for the defamation claim against Q & R.

Soentgen's breach of contract claim against Q & R was interrelated with her wrongful discharge claim against Medcenter, a claim which the trial court determined was not frivolous. The trial court's stated reason for allowing attorney's fees on that claim tracks application of the exhaustion-of-remedies doctrine. There were substantial legal issues about the doctrine of exhaustion of internal remedies that had not been decided before in North Dakota. Soentgen's interference-with-contract claim was also related to the wrongful discharge claims. Under these circumstances, we cannot say that Soentgen could not have reasonably expected judgment in her favor on those claims.

We conclude that the trial court abused its discretion in determining that the def-

---

**3.** N.D.R.Civ.P. 11 says:

> Every pleading of a party represented by an attorney must be signed by at least one attorney of record in the attorney's individual name, whose address must be stated. A party who is not represented by an attorney shall sign the party's pleading, motion, or other paper and state the party's address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of exist-

> ing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it must be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion of a party or upon its own motion, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

amation and breach of contract claims against Q & R were frivolous and that the interference with contract claim against Medcenter was frivolous. *Larson v. Baer.* We therefore reverse the award of attorney's fees for those claims.

Although Soentgen may have voluntarily dismissed her claim for violation of her constitutional rights, the procedures used by the defendants in this case do not indicate that there was such a complete absence of facts and law that, initially, she could not have reasonably expected a favorable judgment on that claim. Her discrimination claim also does not demonstrate such a complete absence of facts and law that she could not have reasonably expected a favorable judgment on that claim. We therefore conclude that the trial court abused its discretion in determining that those claims were frivolous, and we also reverse the award of attorney's fees for those claims.

The summary judgment against Soentgen is affirmed. The award of attorney's fees is reversed.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ., concur.