2014 ND 3

SAGEBRUSH RESOURCES, LLC,
Plaintiff and Appellant

v.

Daryl PETERSON, Larry Peterson, and Galen Peterson, Defendants and Appellees.

No. 20130080.

Supreme Court of North Dakota.

Jan. 14, 2014.

Michael D. Schoepf (argued), Lawrence Bender (on brief), and Amy L. De Kok (on brief), Bismarck, N.D., for plaintiff and appellant.

Derrick L. Braaten (argued) and Lindsey R. Nieuwsma (appeared), Bismarck, N.D., for defendants and appellees.

KAPSNER, Justice.

[¶ 1] Sagebrush Resources, LLC, appeals from a summary judgment dismissing with prejudice its action for trespass and for injunctive relief against Daryl, Larry, and Galen Peterson, determining the action was frivolous and not made in good faith, and awarding the Petersons $23,729 in attorney fees. Sagebrush argues the district court abused its discretion in deciding Sagebrush's claims were frivolous and not made in good faith and in awarding the Petersons $23,729 in attorney fees. We hold the district court did not abuse its discretion in awarding the Petersons attorney fees under N.D.C.C. § 28–26–31, and we affirm.

I

[¶ 2] In April 2011, Sagebrush sued the Petersons, alleging that at all material times it was the owner and operator of several oil and gas wells and related equipment in Bottineau County. Sagebrush alleged the Petersons had wrongfully entered Sagebrush's property without permission and sought damages for trespass and to enjoin them from unlawfully interfering with Sagebrush's oil and gas exploration and production activities. Sagebrush claimed: (1) that "on or about January 28, 2011," Galen Peterson "was seen in, around and on the well site of Rice Well, as well as certain equipment, dikes, berms, tanks and other facilities" owned, used, and operated by Sagebrush in connection with that well; (2) that on September 28, 2010, on March 8, 2011, and on other occasions Daryl Peterson or Larry Peterson "entered into and upon the Cramer Central Tank Battery and climbed onto and upon several of the tanks and other facilities ... for the purpose of taking pictures"; (3) that "on certain occasions in the past year," Daryl Peterson was "in, around and on the well sites for the Bronderslev Wells and the Peterson Wells, as well as on the equipment, dikes, berms, tanks and other facilities owned and used by Sagebrush in connection with its operation" of those wells; and (4) that "on certain occasions over the past year," Daryl Peterson "was seen on the well sites for certain of the Kuroki Wells."

[¶ 3] The Petersons answered, generally denying any wrongdoing. They specifically alleged that Larry and Daryl Peterson entered the Cramer Central Tank Battery at the request of Rick Hummel, the Bottineau Emergency Services Manager, and that Daryl Petersen had been at the site of the Peterson Wells to document spills on his land and had driven on the

lease road for the Bronderslev Wells in the past year. They alleged Sagebrush's claims were frivolous and brought in bad faith for purposes of harassment and intimidation and sought attorney fees and costs under N.D.C.C. §§ 28–26–01 and 28–26–31.

[¶ 4] In responses to discovery, Sagebrush stated that information about the claimed trespass was based on encounters with one or more of the Petersons and review of complaints and information submitted by Daryl Peterson to the North Dakota Industrial Commission, including pictures of the various well sites. Sagebrush stated it was damaged by the Petersons' actions because they:

filed a series of complaints against Sagebrush with the North Dakota Industrial Commission alleging that Sagebrush had violated or was violating North Dakota statutes and regulations that govern the extraction of minerals from below the surface of the land. Such complaints directly impacted Sagebrush's operations because some or all of said complaints resulted in investigations by the North Dakota Industrial Commission. Sagebrush's participation in said investigations led to direct expenditures by Sagebrush. The investigation also caused the North Dakota Industrial Commission to withhold its approval of a planned sale of Sagebrush's interests in the affected units, thereby delaying said sale.

[¶ 5] The Petersons moved for summary judgment, claiming Sagebrush could not show that the Petersons actually entered the well sites without authorization or that Sagebrush was damaged. The Petersons asserted that Sagebrush, as a well operator, did not have a sufficient property interest in the surface estate to maintain a trespass claim under *Hunt Oil Co. v. Kerbaugh*, 283 N.W.2d 131 (N.D.1979). The

Petersons also contended Sagebrush did not have standing to seek injunctive relief because Sagebrush was not currently operating any oil and gas wells in North Dakota and lacked a sufficient property interest in the wells to seek injunctive relief. The Petersons claimed Sagebrush's lawsuit was frivolous and not brought in good faith and sought attorney fees under N.D.C.C. §§ 28–26–01(2) and 28–26–31.

[¶ 6] In an affidavit supporting the Petersons' motion for summary judgment, Daryl Peterson averred he was a board member of the Northwest Landowners Association ("NWLA"), a grassroots organization in northwestern North Dakota working to save farmland and protect agriculture, and stated:

9. On or about March 17, 2011, I met with North Dakota Industrial Commission Inspector Scott Dihle, the adjacent landowner Scott Rice, and Galen Peterson on the township road across from the Rice Well to discuss and point out a spill that occurred on the well site. We did not enter onto the location and we did not take any pictures.

10. I did not enter onto the Cramer Central Tank Battery site on September 28, 2010. I received pictures of the Cramer Central Tank Battery, date stamped September 28, 2010, from an NWLA supporter. I did not take the pictures.

11. On or around early March 8, 2011, I accompanied Rick Hummel, principal manager of the Local Emergency Planning Committee for Bottineau County, and Larry Peterson at Mr. Hummel's request to the Cramer Central Tank Battery, also known as the Rice–Glessing Tank Battery, to inspect a spill and potential release of hazardous substances. I did not take any pic-

tures and did not climb on the tanks or other facilities.

12. With regard to the Bronderslev wells, I stopped on the access road to the Bronderslev location with the permission of surface owner Kent Huber on or about September 2010. I did not enter the location and took pictures only from my position on the road.

13. I have never been to any of the Kuroki Wells.

[¶ 7] Galen Peterson submitted an affidavit stating that on March 17, 2011, he met with Scott Dihle, Scott Rice, and Daryl Peterson on a township road across from the Rice Well to discuss a spill on that well site, but they did not enter the location and did not take any pictures. Larry Peterson also submitted an affidavit, stating: (1) he was a member of the Bottineau County Local Emergency Planning Committee; (2) he did not enter the Cramer Central Tank Battery site or take pictures on September 28, 2010; (3) he accompanied Daryl Peterson and Rick Hummel of the Bottineau County Local Emergency Planning Committee to the Cramer Central Tank Battery on March 8, 2011, to inspect a spill; and (4) he did not take any pictures or climb on any tanks or facilities. The Petersons also submitted an affidavit from Rick Hummel stating that Larry and Daryl Peterson accompanied him to the Cramer Central Tank Battery on March 8, 2011, to inspect a spill.

[¶ 8] Sagebrush resisted the Petersons' motion for summary judgment, arguing it had a legal right to use as much of the surface of its leasehold interest as necessary to explore and produce its mineral interests under *Hunt*, 283 N.W.2d 131, and it provided sufficient evidence of the Petersons' unauthorized entry onto Sagebrush's well sites and equipment to defeat their motion for summary judgment. Sagebrush claimed the Petersons' self-serving denials were insufficient to permit summary judgment because the record clearly demonstrated they provided the Industrial Commission with photographs that could only have been taken from property controlled by Sagebrush and on which the Petersons were not authorized to enter. Sagebrush asserted that by entering Sagebrush's well sites and conducting unauthorized inspections, the Petersons interfered with Sagebrush's use of the well sites. Sagebrush argued the interference, whether technically a trespass or not, was clearly actionable under *Hunt*. Sagebrush claimed actual harm was not an element of trespass and it was required to prove only the Petersons interfered with its property, regardless of whether the interference caused actual damages. Sagebrush also represented that its claim for injunctive relief had become moot as a result of its sale of the property and agreed to dismissal of that claim.

[¶ 9] After a hearing, the district court granted the Petersons' motion for summary judgment. The court stated Sagebrush presented only allegations and no factual evidence to support its claim of an unauthorized physical presence by any of the Petersons on the well sites. The court said assuming the Petersons took photographs on the well sites, that fact did not support a trespass claim because Sagebrush had an implied easement for the limited purpose of using the surface for mining but did not have an ownership or possessory interest necessary to support a trespass claim. The court recognized Sagebrush had a legal right to prohibit interference with its use of the surface but there was no evidence the Petersons interfered with Sagebrush's leasehold interests. The court said that although the Petersons may have taken photographs, there was no evidence the Petersons blocked roadways,

tampered with equipment, harassed employees, or did anything that would interfere with the development of the mineral estate. The court also explained the use of the photographs in proceedings with the Industrial Commission did not constitute harm or damages to Sagebrush in a legal sense because the Petersons had a right to voice concerns with regulatory authorities.

[¶ 10] The district court then determined Sagebrush's lawsuit was frivolous and was not brought in good faith, explaining:

> this is obviously a client-driven lawsuit—I believe this is a frivolous lawsuit. I believe that it was in retaliation for the efforts of the Petersons to pursue their remedies through the Industrial Commission and for the litigation that Daryl Peterson and—I believe it's Christine is his wife's name—brought—had brought prior to the commencement of this lawsuit dealing with the saltwater disposal well case with which I am quite familiar. And it was settled and obviously there must have been some merit to it. Obviously there was merit to at least some of the complaints brought before the Industrial Commission.
>
> And to me this was Sagebrush—this case which, once again, is without any legal or factual basis in my opinion was brought solely to vex, annoy, harass, and intimidate the defendants here. It was not made in good faith. We have allegations that not only don't have any support but are just plain, flat out false.
>
> The one that just keeps coming back to me—and it may be a petty thing but it bothers me when I see a complaint that says Daryl was seen at the Kuroki site and that's just plain, flat out wrong. At most we have this overheard conversation which is subject to interpretation. We don't have any witnesses produced. We have a theory which really didn't apply. And even when you use the liberal construction and say okay well what they meant to be suing for was interference with their leasehold—with their ease—implied easement rights there still wasn't anything there.
>
> It was obviously a suit brought to try and shut these people up or, perhaps, as a bargaining chip with the other litigation. That I don't know and now I'm the one guilty of speculating when I say that. But that's the way I feel about it.

[¶ 11] The Petersons thereafter filed an affidavit by counsel itemizing their attorney fees. Sagebrush responded that Petersons' claimed attorney fees were excessive. Sagebrush's response also recognized its later sale of the properties at issue mooted the request for injunctive relief, but asserted that when the action was initiated in April 2011, the claim for injunctive relief was made in good faith and supported by existing law. The Petersons responded by submitting a March 15, 2011 document from the Industrial Commission to Petro Harvester Operating Company, LLC, approving a "change of operator from Sagebrush ... to Petro Harvester ... 92 wells." An accompanying "notice of transfer of oil and gas wells—form 15" indicates an assignment date of January 28, 2011, from Sagebrush as the transferring operator to Petro Harvester as the receiving operator, but this record does not include an "attached" list identifying the specific wells transferred.

[¶ 12] In awarding the Petersons attorney fees, the district court reiterated its determination that there was no basis in law or fact for Sagebrush's claims and that Sagebrush was not acting in good faith. The court said Sagebrush's "newfound argument it was necessary to sue the [Petersons] to avoid potential liability for personal injuries" on the premises was without merit because "[b]y the time [Sagebrush]

started this lawsuit [it] had already transferred its interests in the subject wells and had no potential premises liability to worry about." The court then awarded the Petersons $23,729 in attorney fees, explaining:

To their credit, counsel for [Sagebrush] do not challenge the propriety of the hourly rates charged by the [Petersons'] lawyers. Rather, [Sagebrush] focuses on potentially unnecessary and excessive hours listed by the [Petersons'] counsel.

The quality of the work product prepared by all of the lawyers in this case was outstanding. Although the law firm employed by [Sagebrush] is of national standing, the law firm representing the [Petersons] has a well deserved reputation for expertise in oil and gas matters and related fields of law. Obviously the result achieved by the efforts of the [Petersons'] lawyers was everything that their clients could have hoped for.

[Sagebrush] questioned hours devoted to the review of the transcripts of depositions taken in another lawsuit involving [Sagebrush] and Defendant Daryl Peterson. This work was done by a paralegal at an hourly rate substantially less than the sums charged for the lawyer's time. Surely there was the potential for discovery of information that could very well have been of benefit at the trial of this case. This would be legitimate trial preparation and the fact that this case was subsequently dismissed on a motion for summary judgment does not defeat the legitimacy of appropriate trial preparation measures.

[Sagebrush] also raise[s] sincere questions about the number of hours devoted to the preparation of the briefs that were submitted on behalf of the [Petersons]. As indicted above, this court was most impressed by the quality of the filings of the parties and does not question the fact that considerable effort was put into research, organization, drafting and redrafting of the briefs. To arbitrarily cut the number of hours would be a speculative task that this court finds to be inappropriate.

This court does agree with [Sagebrush's] questioning of the need for sending two lawyers to Bottineau for the hearing on the Motion for Summary Judgment. The 9.1 hours charged by Attorney Nieuwsma for September 7, 2012 should be deleted. This would result in a reduction of $1,137.50.

## II

■ [¶ 13] Sagebrush does not challenge the district court's summary judgment dismissal of its lawsuit against the Petersons. Rather, Sagebrush argues the court erred in awarding attorney fees to the Petersons under N.D.C.C. §§ 28–26–01 or 28–26–31, because the court abused its discretion in deciding that when filed, Sagebrush's claims were frivolous and not made in good faith. Sagebrush argues its claims were not frivolous under N.D.C.C. § 28–26–01 and an award of attorney fees was not justified on this record under N.D.C.C. § 28–26–31.

■ [¶ 14] Under North Dakota law, parties to a lawsuit generally pay their own attorney fees, absent statutory or contractual authority. *Strand v. Cass County*, 2008 ND 149, ¶ 9, 753 N.W.2d 872.

■ [¶ 15] Section 28–26–01(2), N.D.C.C., requires courts in civil actions to award attorney fees to the prevailing party upon finding a claim for relief is frivolous. *Strand*, 2008 ND 149, ¶ 11, 753 N.W.2d 872. "Frivolous claims are those which have 'such a complete absence of actual facts or law that a reasonable person could not have expected that a court would ren-

der judgment in [that person's] favor.'" *Deacon's Dev., LLP v. Lamb*, 2006 ND 172, ¶ 12, 719 N.W.2d 379 (quoting *Peterson v. Zerr*, 477 N.W.2d 230, 236 (N.D. 1991) and N.D.C.C. § 28–26–01(2)). If a court determines a claim is frivolous, the plain language of N.D.C.C. § 28–26–01(2) requires the court to award attorney fees regardless of the good faith of the attorney or party making the claim *Strand*, at ¶¶ 11–12. We have recognized " '[a]uthorizations of attorney's fees for frivolous claims are not meant to chill enthusiasm and creativity in pursuing factual or legal theories, and a court should not use the wisdom of hindsight to determine whether claims are frivolous,'" because " '[i]f the law is unclear or unsettled on a particular claim, that circumstance makes it more likely that a party might reasonably expect to prevail on that claim.'" *Strand*, at ¶ 11 (quoting *Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d 73, 84–85 (N.D. 1991)). Under N.D.C.C. § 28–26–01(2), a court has discretion to determine whether a claim is frivolous and to decide the amount and reasonableness of an award of attorney fees, but if the court decides a claim is frivolous, the court must award attorney fees. *Strand*, at ¶¶ 12–13. A court's discretionary determinations under N.D.C.C. § 28–26–01(2) will not be overturned on appeal absent an abuse of discretion. *Strand*, at ¶¶ 11–12.

[¶ 16] Under N.D.C.C. § 28–26–31, a district court is authorized to award attorney fees for "[a]llegations and denials in any pleadings in court, made without reasonable cause and not in good faith, and found to be untrue." Under that language, this Court has said that an award of attorney fees "requires a finding that allegations and denials in any pleadings are made without reasonable cause and not in good faith, and found to be untrue." *Westchem Agric. Chems., Inc. v. Engel*, 300 N.W.2d 856, 859 (N.D.1980). We have

said an award of attorney fees under N.D.C.C. § 28–26–31 is within a district court's discretion, but we have also recognized that "[a]lthough the district court's award of attorney's fees and costs under N.D.C.C. § 28–26–31 is discretionary, the court's exercise of that discretion must be based on evidence that the pleadings were made without reasonable cause and not in good faith, and are found to be untrue." *Strand*, 2008 ND 149, ¶ 14, 753 N.W.2d 872.

[¶ 17] A district court "abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, when the court misinterprets or misapplies the law, or when its decision is not the product of a rational mental process leading to a reasoned determination." *Barrett v. Gilbertson*, 2013 ND 35, ¶ 25, 827 N.W.2d 831.

[¶ 18] Within that framework for awarding attorney fees under either N.D.C.C. § 28–26–01(2) or N.D.C.C. § 28–26–31, we examine Sagebrush's claims. Sagebrush's complaint alleged a claim for damages for trespass for wrongful and unauthorized entry on equipment and on oil and gas wells owned and operated by Sagebrush and a claim for injunctive relief to prevent the Petersons from unlawfully interfering with Sagebrush's oil and gas exploration and production activities.

[¶ 19] An actionable claim for trespass to chattels or personal property generally requires dispossession of the property, impairment of the condition, quality or value of the property, loss of use of the property, or other harm. *See* Restatement (2nd) of Torts § 218 (1965); 1 Dan B. Dobbs, Paul T. Hayden, and Ellen M. Bublick, *The Law of Torts* § 60 (2nd ed.2011); W. Page Keeton, *Prosser and Keeton on Torts* § 14 (5th ed.1984). Sagebrush did not allege or attempt to es-

tablish a factual basis to support a claim that it lost use of or was dispossessed of any equipment or other personal property, or that the property's condition, quality, or value was impaired. Allegations of that nature, if established, could support a claim for trespass to chattels. Rather, Sagebrush's discovery responses stated it was damaged by the Petersons' complaints to the Industrial Commission. However, surface owners may submit written complaints to the Industrial Commission to investigate alleged violations of "oil and gas conservation statutes or any rule, regulation, or order of the commission." N.D. Admin. Code § 43–02–03–54. Any complaints the Petersons made to the Industrial Commission do not constitute harm sufficient to support a claim for trespass to chattels.

[¶ 20] To the extent Sagebrush's complaint includes a claim for trespass to real property, this Court has "defined trespass as 'an "intentional harm,"'" where a person " 'intentionally and without a consensual or other privilege ... enters land in possession of another or any part thereof or causes a thing or third person so to do.' " *Tibert v. Slominski*, 2005 ND 34, ¶ 15, 692 N.W.2d 133 (quoting *McDermott v. Sway*, 78 N.D. 521, 529–30, 50 N.W.2d 235, 240 (1951)). The essence of a trespass to real property is interference with possession of land, and this Court has said a person who commits a trespass " 'is liable as a trespasser to the other irrespective of whether harm is thereby caused to any of his legally protected interests.' " *Tibert*, at ¶ 15 (quoting *McDermott*, at 530, 50 N.W.2d at 240). *See* 75 Am.Jur.2d *Trespass* § 18 (2007). Under North Dakota law, an oil and gas lessee acquires an easement in the surface estate for purposes of developing its mineral estate. *Slaaten v. Cliff's Drilling Co.*, 748 F.2d 1275, 1278 (8th Cir.1984). This Court has

said an easement is a nonpossessory interest in land belonging to another which entitles the easement holder to limited use or enjoyment of the land. *Schatz v. Schatz*, 419 N.W.2d 903, 907 (N.D.1988).

[¶ 21] In line with the foregoing authorities, Sagebrush acknowledges the Petersons' alleged actions "may not technically constitute a trespass under North Dakota law," but asserts it was entitled to pursue injunctive relief to preclude interference with its exploration and production activities.

[¶ 22] In *Hunt*, 283 N.W.2d at 135, this Court held an oil and gas lessee had an implied right to use as much of the surface as reasonably necessary in exploring, mining, removing, and marketing minerals. This Court explained, however, the oil and gas lessee must give due regard for the surface owner's rights and must exercise that degree of care and use which is a just consideration for the surface owner's rights. *Id.* We adopted the "accommodation" doctrine for evaluating the interests of the oil and gas lessee and the surface owner:

" 'The reasonableness of a surface use by the lessee is to be determined by a consideration of the circumstances of both and, as stated, the surface owner is under the burden of establishing the unreasonableness of the lessee's surface use in this light. The reasonableness of the method and manner of using the dominant mineral estate may be measured by what are usual, customary and reasonable practices in the industry under like circumstances of time, place and servient estate uses. What may be a reasonable use of the surface by the mineral lessee on a bald prairie used only for grazing by the servient surface owner could be unreasonable within an existing residential area of the City of Houston, or on the campus of the Uni-

versity of Texas, or in the middle of an irrigated farm. What we have said is that in determining the issue of whether a particular manner of use in the dominant estate is reasonable or unreasonable, we cannot ignore the condition of the surface itself and the uses then being made by the servient surface owner.... [I]f the manner of use selected by the dominant mineral lessee is the only reasonable, usual and customary method that is available for developing and producing the minerals on the particular land then the owner of the servient estate must yield. However, if there are other usual, customary and reasonable methods practiced in the industry on similar lands put to similar uses which would not interfere with the existing uses being made by the servient surface owner, it could be unreasonable for the lessee to employ an interfering method or manner of use. These [conditions] involve questions to be resolved by the trier of the facts.' "

*Id.* at 136–37 (quoting *Getty Oil Co. v. Jones,* 470 S.W.2d 618, 627–28 (Tex.1971) (on motion for rehearing)).

[¶ 23] Other courts have also recognized the viability of an oil and gas lessee's action to enjoin others from interfering with the lessee's reasonable use of the surface for oil and gas development. *See Getty Oil Co. v. Royal,* 422 S.W.2d 591, 592–94 (Tex.Civ.App.1967) (recognizing oil and gas lessee's action against surface owner to enjoin construction across access roads to oil and gas wells and upholding jury verdict that surface owner's placement of gates on roads was not unreasonable interference with lessee's operation of oil and gas well); *Flying Diamond Corp. v. Rust,* 551 P.2d 509, 510–12 (Utah 1976) (recognizing oil and gas lessee's action to enjoin surface owner from interfering with oil drilling operation); *Mingo Oil Producers v. Kamp Cattle Co.,* 776 P.2d 736, 740–

42 (Wyo.1989) (recognizing oil and gas lessee's action against surface owner to establish right to access for development and production).

[¶ 24] Those authorities provide an oil and gas lessee with a cause of action to enjoin surface owners or others from interfering with its implied right to use as much of the surface as is reasonably necessary for exploring, mining, removing, and marketing minerals. *Hunt,* 283 N.W.2d at 135–40. In appropriate circumstances, an action for injunctive relief allows a court to enjoin a surface owner or others from unlawfully interfering with the lessee's right to use as much of the surface as is reasonably necessary for exploring, mining, removing, and marketing minerals.

[¶ 25] Here, Sagebrush's complaint includes a claim for injunctive relief for unlawful interference with Sagebrush's lease interest under *Hunt.* However, there is evidence in this record to support the district court's determination that when Sagebrush initiated this lawsuit against the Petersons in April 2011, it had transferred its interest as an operator of the wells to Petro Harvester. Other than allegations in its complaint, Sagebrush identified no evidence establishing an interest in the wells when it initiated its claim for injunctive relief in April 2011. Evidence in the record supports the court's determination that Sagebrush transferred its interests in the subject wells to Petro Harvester before it initiated this lawsuit.

[¶ 26] On that record, the district court reiterated that Sagebrush's claims were both frivolous and false and not made in good faith. Section 28–26–31, N.D.C.C., authorizes a court to award attorney fees for allegations "made without reasonable cause and not in good faith, and found to be untrue." Under this Court's deferential standard of review, we conclude the

district court did not misapply the law or act arbitrarily, unreasonably, or unconscionably in deciding that to the extent Sagebrush made a claim for unlawful interference with an oil and gas lessee's interest, that claim was made without reasonable cause, not in good faith, and found to be untrue. We conclude the court did not abuse its discretion in deciding to award the Petersons attorney fees under N.D.C.C. § 28–26–31.

## III

[¶ 27] Sagebrush argues the district court abused its discretion in deciding the Petersons' requested attorney fees were not excessive and in awarding them $23,729. Sagebrush claims the court did not examine the number of hours claimed by the Petersons for attorney fees and did not evaluate whether that number of hours was reasonable in light of the nature of the case.

[¶ 28] Sagebrush did not seek to cross-examine any witnesses about the amount or reasonableness of attorney fees claimed by the Petersons. *See Westchem*, 300 N.W.2d at 859–60. The district court provided a reasoned explanation for the amount of the award of attorney fees and did not misapply the law. Under this Court's deferential standard of review, we conclude the court's award of $23,729 in attorney fees was not arbitrary, unreasonable, or unconscionable and the court did not abuse its discretion in its award.

## IV

[¶ 29] The Petersons argue Sagebrush's appeal is frivolous under N.D.R.App.P. 38 and request attorney fees on appeal.

[¶ 30] Under N.D.R.App.P. 38, this Court may award costs, including attorney fees, if it determines an appeal is frivolous. " 'An appeal is frivolous if it is flagrantly groundless, devoid of merit, or demonstrates persistence in the course of litigation which could be seen as evidence of bad faith.' " *Lucas v. Porter*, 2008 ND 160, ¶ 28, 755 N.W.2d 88 (quoting *Witzke v. City of Bismarck*, 2006 ND 160, ¶ 19, 718 N.W.2d 586). We conclude Sagebrush's appeal from the decision awarding attorney fees is not flagrantly groundless, devoid of merit, nor does it evidence persistence in the course of litigation which demonstrates bad faith. We conclude Sagebrush's appeal is not frivolous, and we decline to award the Petersons attorney fees on appeal.

## V

[¶ 31] We affirm the judgment.

[¶ 32] MARY MUEHLEN MARING, S.J., CAROL RONNING KAPSNER, DANIEL J. CROTHERS, and DALE V. SANDSTROM, JJ., concur.

[¶ 33] The Honorable LISA FAIR McEVERS was not a member of the Court when this case was heard and did not participate in this decision. Surrogate Judge MARY MUEHLEN MARING, sitting.

VANDEWALLE, Chief Justice, concurring specially.

[¶ 34] I concur in the result reached in the opinion of the Court. I agree the oil and gas lessee has a limited right to use the surface to produce the oil and gas and the surface owner does not lose all right to use that surface even though the mineral interest is the dominant estate. *Hunt Oil Co. v. Kerbaugh*, 283 N.W.2d 131, 135 (N.D.1979). I write specially to note my belief that the oil and gas lessee does have the right and perhaps the responsibility to keep people, including the surface owner, off of dangerous property the lessee is

using to produce the oil and gas, such as tank batteries, open pits, pumps, etc. Here the evidence supports the trial court's determination that, for retaliatory reasons, Sagebrush attempted to restrict the defendants beyond what was necessary to accomplish safety purposes.

[¶ 35]  GERALD W. VANDE WALLE, C.J.