Martin WISHNATSKY, Plaintiff
and Appellant,

v.

Paul BERGQUIST, individually and as editor of the NDSU Spectrum; John Willoughby, individually and as an NDSU police officer; Thomas Bernd, individually and as an NDSU police officer; Tim Lee, Chief of Police, North Dakota State University; James Ozbun, President, North Dakota State University, Defendants and Appellees.

Civil No. 950172.

Supreme Court of North Dakota.

May 29, 1996.

Rehearing Denied June 27, 1996.

Martin Wishnatsky, Fargo, pro se.

Mark B. Bring (argued), of Vogel, Kelly, Knutson, Weir, Bye & Hunke, Ltd., Fargo, for defendants and appellees.

MESCHKE, Justice.

Martin Wishnatsky appeals from a summary judgment dismissing his claims for false arrest against officials of North Dakota State University (NDSU) and the editor of the NDSU student newspaper. We affirm.

## I. BACKGROUND

In early 1993, Wishnatsky, who was not an NDSU student, sought to place ads expressing his anti-abortion views in the NDSU student newspaper, the *Spectrum*. He met with Paul Bergquist, editor of the *Spectrum*, and various NDSU officials to discuss the matter. On April 7, 1993, Wishnatsky went to the *Spectrum* offices in the NDSU student union building to see if an ad he had submitted had run in the latest edition. After a brief encounter, Bergquist asked Wishnatsky to leave the *Spectrum* offices. When Wishnatsky refused to leave despite Bergquist's repeated requests that he do so, Bergquist called the campus police for assistance.

Before the campus police arrived, Wishnatsky left the *Spectrum* offices and sat down in the Students Older Than Average (SOTA) lounge, located down the hall from the *Spectrum* offices in the student union. Bergquist made two additional calls to the campus police: one to inform them Wishnatsky had left the *Spectrum* offices, and another to advise them Wishnatsky was still in the building. Officers John Willoughby and Thomas Bernd of the NDSU campus police responded to the calls. They spoke briefly to Bergquist in the *Spectrum* offices, and were told by another student that the man they were looking for was in the SOTA lounge.

Willoughby and Bernd approached Wishnatsky, asked his name repeatedly, and inquired whether he had any legitimate business on campus. Wishnatsky refused to answer. Willoughby told Wishnatsky that NDSU had a trespassing policy for non-students who had no legitimate business on campus, and he advised Wishnatsky he could give him a trespass "warning card" authorized by the trespass policy. Willoughby gave Wishnatsky a copy of the NDSU trespass policy that quoted the North Dakota Century Code, NDCC 12.1–22–03(3), on criminal trespass. Willoughby also showed Wishnatsky a trespass warning card that stated: "I must ask you to leave the university campus and if you refuse or return you may be arrested for trespassing." Wishnatsky still refused to give his name or answer any questions.

What happened next is disputed. Willoughby and Bernd assert that they asked Wishnatsky to come to the campus police station, and Wishnatsky voluntarily went with them. Wishnatsky asserts in an affidavit that the officers advised him they would take him into custody if he did not give his name, and then "laid hands upon me" and "escorted me out of the building to the police car outside." Wishnatsky was taken to the campus police station, where he met with Tim Lee, the campus chief of police. After a brief discussion about the situation, Wishnatsky left the police station.

Eleven days later, Wishnatsky began this action in county court against Bergquist, Willoughby, and Bernd, and also against Lee

and James Ozbun, President of NDSU, in only their official capacities, alleging claims under state law and 42 USC § 1983 for false arrest. Wishnatsky also sought a declaratory judgment that the NDSU trespass policy was unconstitutional.

On October 15, 1993, the county court ordered entry of partial summary judgment dismissing the declaratory judgment claim, holding that it did not have subject matter jurisdiction over the declaratory judgment action, and that Wishnatsky did not have standing to challenge the constitutionality of the trespass policy because he was never issued a trespass warning card under the policy.[1] Wishnatsky has not appealed from the county court's ruling.

The defendants then moved for summary judgment dismissing Wishnatsky's remaining claims under state law and 42 USC § 1983 for damages. Wishnatsky opposed the motion and sought to amend his complaint to assert "supervisory authority" claims under § 1983 against Tim Lee and Rick Johnson, NDSU's general counsel, for their roles in developing and implementing the trespass policy. At the hearing on the motions, Wishnatsky orally moved to amend his complaint to allege gross negligence by Willoughby and Bernd.

The trial court[2] ordered summary judgment dismissing the remaining claims, concluding that (1) the claims against the defendants in their official capacities were barred by sovereign immunity; (2) the § 1983 claims could not be asserted against the defendants in their official capacities; (3) Wishnatsky was not arrested; (4) if Wishnatsky was arrested, Willoughby and Bernd had probable cause to believe Wishnatsky had committed misdemeanor criminal trespass in their pres-

ence; (5) there was no evidence Bergquist had provided false information or ordered the officers to arrest Wishnatsky; and (6) the defendants were immune from liability in their individual capacities for Wishnatsky's claims. The court did not specifically address Wishnatsky's motions to amend his complaint, but judgment was entered dismissing all claims against all defendants. Wishnatsky appealed.[3]

## II. STANDARDS OF REVIEW

 Summary judgment under NDRCivP 56 is a procedural device for the expeditious disposition of controversies without a trial when, after viewing the evidence in the light most favorable to the opposing party and giving that party the benefit of all favorable inferences, there is no genuine issue of material fact or inferences to be drawn from undisputed facts, or only questions of law remain. *Reiger v. Wiedmer,* 531 N.W.2d 308, 310 (N.D.1995); *North Shore, Inc. v. Wakefield,* 530 N.W.2d 297, 299 (N.D.1995). The party seeking summary judgment bears the initial burden of showing the absence of genuine issues of material fact. *Zueger v. Carlson,* 542 N.W.2d 92, 94 (N.D.1996); *Kary v. Prudential Insurance Co.,* 541 N.W.2d 703, 705 (N.D.1996). Once the moving party meets that initial burden, the opposing party may not rest upon mere allegations or denials in the pleadings, but must present competent admissible evidence establishing a genuine issue of material fact. *Zueger,* 542 N.W.2d at 94. As we explained in *North Shore,* 530 N.W.2d at 299, even if a factual dispute exists, summary judgment is appropriate if the law is such that resolution of the factual dispute will not change the result.

1. The NDSU trespass policy authorized a trespass warning card to be issued to any non-student without legitimate business on campus. The warning card advised persons that they had to leave the campus, and that they would be subject to arrest for trespassing if they refused to leave or returned. NDSU later amended the policy, and Wishnatsky concedes his declaratory judgment claim is moot.

2. Effective January 1, 1995, the county courts were abolished and new district court judgeships were created, with pending county court cases

transferred to district court. *See* NDCC 27–05–00.1; *In re Estate of Zimbleman,* 539 N.W.2d 67, 73 n. 1 (N.D.1995); *Agassiz West Condominium Association v. Solum,* 527 N.W.2d 244, 249 (N.D. 1995). The same judge handled all proceedings in this matter, first as a county judge, then after January 1, 1995, as a district judge.

3. Wishnatsky does not challenge the court's dismissal of all claims against the defendants in their official capacities, and concedes that all claims against Ozbun were properly dismissed.

Rule 56 requires the entry of summary judgment against a party who fails to establish the existence of a factual dispute for an essential element of his claim that he would have to prove at a trial. *Soentgen v. Quain & Ramstad Clinic, P.C.,* 467 N.W.2d 73, 77 (N.D.1991). As *Soentgen* said, when no pertinent evidence on an essential element is presented in resistance to the motion for summary judgment, it is presumed that no such evidence exists.

Wishnatsky asserts that the defendants failed to properly support their motion for summary judgment because the only affidavit submitted was by Tim Lee, the NDSU chief of police. Wishnatsky argues that Lee had no personal knowledge of the occurrences at the student union, and his allegations made on information and belief do not satisfy the requirement of NDRCivP 56(e) that affidavits in support of a summary judgment motion be made on personal knowledge. Wishnatsky therefore claims the motion was not properly supported and should have been denied.

We might agree with Wishnatsky if Lee's affidavit was the only evidence presented to support the motion. In this case, however, there were extensive answers to interrogatories, signed and sworn to by Willoughby, Bernd, and Bergquist, that set forth their versions of the events at the student union. Answers to interrogatories may be used to support a motion for summary judgment. NDRCivP 56(c); *Kary,* 541 N.W.2d at 705. We conclude the motion was properly made and supported, and Wishnatsky then had the burden to show genuine issues of material fact.

## III. ARREST

The defendants assert, and the court concluded, that Wishnatsky was not arrested or otherwise detained against his will, but voluntarily accompanied the officers to the NDSU police station. Wishnatsky argues his affidavit raises genuine issues of material fact about whether he was arrested.

For an arrest, there must be a detention of the person by means of physical force or show of authority. *State v. Ritter,* 472 N.W.2d 444, 447 (N.D.1991). As explained in *State v. Anderson,* 336 N.W.2d 634, 639 (N.D. 1983), formal words of arrest are not required, but circumstances must exist that would cause a reasonable person to conclude that he was under arrest and not free to leave.

Although the evidence presented to the trial court on this issue was in conflict, Wishnatsky, as the party opposing summary judgment, is entitled to all favorable inferences. *Reiger,* 531 N.W.2d at 310. In his affidavit, Wishnatsky says Willoughby stated, "If you do not give me your name, we are taking you into custody." According to his affidavit, the officers then "laid hands upon" Wishnatsky, escorted him out of the building to the patrol car, and took him to the campus police station. Wishnatsky's affidavit is sufficient to raise an issue of fact about whether he was arrested. For purposes of our analysis on the remaining issues, we therefore view the evidence in the light most favorable to Wishnatsky and assume that he was arrested.

## IV. BERGQUIST

Wishnatsky asserts the court erred in dismissing his claims against Bergquist because his affidavit raised genuine issues of material fact about Bergquist's role in the arrest. Wishnatsky's theory of the case is that Bergquist instigated his arrest by providing false information to the police that resulted in his arrest.

Wishnatsky asserts that "[a] private citizen is responsible for instigating a false arrest if he either directs that the arrest be made or provides false information that is material in the arrest occurring." This is a correct statement of the general rule. *See, e.g., Johnson v. First National Bank & Trust Co.,* 207 Neb. 521, 300 N.W.2d 10, 13 (1980); *Harrison v. Southland Corp.,* 544 S.W.2d 692, 693 (Tex.Civ.App.1976); 3 Lee & Lindahl, Modern Tort Law § 41.02 (rev. ed.1990); Restatement (Second) of Torts § 45A cmt. c (1965); Landis, Annotation, *False Imprisonment: Liability of Private Citizen, Calling on Police for Assistance after Disturbance or Trespass, for False Arrest by Officer,* 98 A.L.R.3d 542 § 2 (1980).

However, where a private citizen merely summons the police for assistance or to report an offense, and does not specifically request that the person be arrested nor supply false information, no liability for false arrest arises. *See Harrison,* 544 S.W.2d at 693; Landis, 98 A.L.R.3d at § 2; 32 Am. Jur.2d *False Imprisonment* § 41 (1995). And there is no liability where a private citizen merely provides information to the police and leaves the decision whether to arrest to the officer's judgment and discretion. *E.g., Johnson,* 300 N.W.2d at 13; 3 Lee & Lindahl, at § 41.02; Prosser & Keeton, Torts § 11 (5th ed.1984); Restatement (Second) of Torts, at § 45A cmt. c; *see also Larson v. Baer,* 418 N.W.2d 282, 287 (N.D. 1988) (there is no liability for malicious prosecution if a private citizen merely gives authorities information he believes to be true and leaves the decision to prosecute to the officer's discretion).

 Wishnatsky claims that his affidavit, when viewed in the light most favorable to him, raises genuine issues of material fact whether Bergquist provided false information to the police. The only "evidence" in Wishnatsky's affidavit directly on this point is Wishnatsky's version of the officers' questioning:

"Why are you questioning me about this?" I asked. Thinking it over later I realized that Mr. Bergquist must have painted a rather lurid and over-imaginative picture of what had happened in the *Spectrum* office during our visit. Knowing his excitable tendencies I could understand why the officers were acting so peculiar, but I thought it rather naive of them to take his statements at face value.

Wishnatsky's assertions are rank speculation and conjecture and, lacking personal knowledge about Bergquist's statements to the officers, have no function in an affidavit for summary judgment. As Wishnatsky himself cogently pointed out in challenging Lee's affidavit, an affidavit under NDRCivP 56(e) must be made upon personal knowledge. Statements may not be made upon informa-

tion and belief, and certainly not upon speculation or conjecture.

Wishnatsky also asserts, however, that he had personal knowledge of Bergquist's first telephone call to police because he was still present in the *Spectrum* offices when Bergquist placed the call. He asserts that Bergquist's call constituted "false information" because he had no reason to make the call. The evidence in the record, including Wishnatsky's affidavit, shows only that Bergquist called the campus police and requested assistance with a person who refused to leave. Wishnatsky concedes that he refused to leave the office after being asked to do so.

There is no support for Wishnatsky's assertion that Bergquist's call constituted "false information" because Bergquist had no reason to call. Part of NDCC 12.1–22–03(4) declares:

> A person is guilty of a class B misdemeanor if that person remains upon the property of another after being requested to leave the property by a duly authorized person.

Bergquist was justified in calling campus police for assistance with a person who refused to leave the office, and his actions did not give false information.[4]

Although not relied upon by Wishnatsky for his argument on this issue, we note his affidavit suggests that the officers mentioned Bergquist's involvement. In describing the questioning by the officers, Wishnatsky's affidavit states that the officers asked if he had legitimate business on campus; he replied by asking why they were asking him rather than other people in the SOTA lounge; Willoughby purportedly responded, "on request that Mr. Bergquist asked me to." Without considering the hearsay problems in relying upon that statement as proof that Bergquist asked the officers to question Wishnatsky, it does not evidence that Bergquist instigated or demanded Wishnatsky's arrest.

The record before the trial court showed, at most, that Bergquist called the police for

---

**4.** Wishnatsky does not assert that he had any right under the statute to remain in the *Spectrum* offices after Bergquist asked him to leave.

assistance with a person who refused to leave the *Spectrum* offices. There is no evidence that Bergquist demanded that Wishnatsky be arrested, or that he conveyed any false information to the police. It was incumbent upon Wishnatsky to supply that evidence and, because he failed to do so, we must assume no such evidence exists. *See Soentgen,* 467 N.W.2d at 77. Dismissal of the claims against Bergquist was appropriate.

## V. WILLOUGHBY AND BERND

Wishnatsky asserts that the court erred in dismissing his claims against Willoughby and Bernd in their individual capacities. The trial court gave several reasons for dismissal of the claims, concluding that Wishnatsky was not arrested; that if he was arrested, there was probable cause to arrest; and that the officers were protected by qualified and statutory immunity.

As we said earlier, we assume for purposes of this appeal that Wishnatsky was arrested. We need not determine whether the officers had probable cause to arrest Wishnatsky because we conclude that, even if probable cause was lacking, the officers are immune from suit under the undisputed facts in this case.

Before addressing the parties' immunity arguments, we outline the context. Wishnatsky argues that he was arrested in violation of NDCC 29–06–15(1) for a misdemeanor not committed in the officers' presence. His argument is based upon the mistaken premise that the officers arrested him for the alleged trespass when he refused to leave the *Spectrum* offices, before the officers arrived. Willoughby and Bernd assert that Wishnatsky was arrested for trespassing in the SOTA lounge, not for trespassing in the *Spectrum* offices. They assert Wishnatsky's actions in the SOTA lounge created probable cause to believe he was violating NDCC 12.1–22–03(3) by a misdemeanor trespass in their presence.

### A. *Qualified Immunity*

 State law-enforcement officials sued under § 1983 for false arrest have qualified immunity from suit. *See Elder v. Holloway,* 510 U.S. 510, 511–12, 114 S.Ct. 1019, 1021, 127 L.Ed.2d 344 (1994); *Malley v. Briggs,* 475 U.S. 335, 340, 106 S.Ct. 1092, 1095, 89 L.Ed.2d 271 (1986); *Klindtworth v. Burkett,* 477 N.W.2d 176, 180 n. 2 (N.D.1991). The primary purpose for qualified immunity is to protect public officials from undue interference with their duties and from potentially disabling threats of liability. *Elder,* 510 U.S. at 513–14, 114 S.Ct. at 1022; *see also Habiger v. City of Fargo,* 80 F.3d 289, 295 (8th Cir.1996) ("The qualified immunity doctrine allows officers to make reasonable errors so that they do not always 'err on the side of caution,' " citing *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991)). As we explained in *Livingood v. Meece,* 477 N.W.2d 183, 192 (N.D.1991), this doctrine recognizes the need for government officials to be free from harassing lawsuits and from apprehension of personal liability when they reasonably exercise authority and discretion while performing their duties in the public interest.

 In assessing qualified immunity claims, we apply an objective standard to determine the legal reasonableness of the challenged official action. *See Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *Klindtworth,* 477 N.W.2d at 180 n. 2. Qualified immunity analysis requires the court to consider the operation of the rule in the context of the circumstances that confronted the official. *Ennis v. Dasovick,* 506 N.W.2d 386, 393 (N.D.1993); *Livingood,* 477 N.W.2d at 194. Precedent demonstrates, (*Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991); *Bridgewater v. Caples,* 23 F.3d 1447, 1449 (8th Cir.1994); *Arnott v. Mataya,* 995 F.2d 121, 123 (8th Cir. 1993)), that the question of qualified immunity is ordinarily one of law for the court to decide.

 Because qualified immunity is " 'an *immunity from suit* rather than a mere defense to liability,' " the United States Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter,* 502 U.S. at 227, 112 S.Ct. at 536 (emphasis in original) (quoting *Mitchell*

*v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)). If the challenged actions are ones a reasonable officer could have believed were lawful, the claims should be dismissed before discovery and on summary judgment, if possible. *Anderson,* 483 U.S. at 640 n. 2, 646 n. 6, 107 S.Ct. at 3039 n. 2, 3042 n. 6; *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815. As *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815, explained, and *Klindtworth,* 477 N.W.2d at 178, reiterated, qualified immunity is an entitlement not to stand trial or face the other burdens of litigation, and it is effectively lost if a case is erroneously permitted to go to trial.

■■■■■ For false arrest claims against law enforcement officers, the United States Supreme Court employs a broad formulation of qualified immunity. The Court's decision in *Hunter* illustrates this. Secret Service agents Hunter and Jordan were sued by Bryant for an alleged improper arrest without probable cause. The Court summarized the application of qualified immunity in this context:

Our cases establish that qualified immunity shields agents Hunter and Jordan from suit for damages if "a reasonable officer could have believed [Bryant's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). Even law enforcement officials who "reasonably but mistakenly conclude that probable cause is present" are entitled to immunity. *Ibid.* ...

... The Court of Appeals' confusion is evident from its statement that "[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment ... based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach." [*Bryant v. United States Treasury Department,*] 903 F.2d [717,] 721 [ (9th Cir.1990) ]. This statement of law is wrong for two reasons. First, it routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. See *Mitchell, su-*

*pra,* 472 U.S., at 527–529, 105 S.Ct., at 2815–2817. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

Under settled law, Secret Service agents Hunter and Jordan are entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest Bryant. Probable cause existed if "at the moment the arrest was made ... the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that Bryant had violated 18 U.S.C. § 871. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

*Hunter,* 502 U.S. at 227–228, 112 S.Ct. at 536–537. After analyzing the facts in the record, the Court concluded:

These undisputed facts establish that the Secret Service agents are entitled to qualified immunity. Even if we assumed, *arguendo,* that they (*and* the magistrate) erred in concluding that probable cause existed to arrest Bryant, the agents nevertheless would be entitled to qualified immunity because their decision was reasonable, even if mistaken. *Anderson, supra,* 483 U.S., at 641, 107 S.Ct., at 3040.

The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley, supra,* 475 U.S., at 343, 341, 106 S.Ct., at 1097, 1096. This accommodation for reasonable error exists because "officials should not err always on the side of caution" because they fear being sued. *Davis [v. Scherer,]* 468 U.S. [183,] 196, 104 S.Ct. [3012,] 3020 [82 L.Ed.2d 139] [1984].

*Hunter,* 502 U.S. at 228–229, 112 S.Ct. at 537. We must employ the same analysis in this case.

Qualified immunity does not require that there was, in fact, probable cause to arrest. *E.g., Bridgewater,* 23 F.3d at 1449; *Arnott,* 995 F.2d at 123. As summarized by the court in *Sanders v. Sears, Roebuck & Co.,*

984 F.2d 972, 976 (8th Cir.1993): "What matters in a qualified immunity inquiry is whether a reasonable officer could have believed the arrest to be lawful." *See also Habiger v. City of Fargo,* 80 F.3d at 295 (" '[t]he issue for immunity purposes is not probable cause in fact but arguable probable cause,' . . . that is, whether the officer should have known that the arrest violated plaintiff's clearly established right, . . .' " (citations omitted)). Accordingly, Willoughby and Bernd are immune from suit if a reasonable officer could have believed there was probable cause to arrest Wishnatsky.

■ Willoughby and Bernd urge that they were justified in arresting Wishnatsky for misdemeanor trespass under NDCC 12.1–22–03(3) for his actions in the SOTA lounge in their presence. The relevant part of NDCC 12.1–22–03(3) declares:

A person is guilty of a class B misdemeanor if, knowing that that person is not licensed or privileged to do so, that person enters or remains in any place as to which notice against trespass is given by actual communication to the actor by the person in charge of the premises or other authorized person or by posting in a manner reasonably likely to come to the attention of intruders. . . .

Section 29–06–15(1)(a) authorizes a police officer to arrest for a misdemeanor committed in the officer's presence:

A law enforcement officer, without a warrant, may arrest a person:

a. For a public offense, committed or attempted in the officer's presence; and for the purpose of this subdivision, a crime must be deemed committed or attempted in the officer's presence when what the officer observes through the officer's senses reasonably indicates to the officer that a crime was in fact committed or attempted in the officer's presence by the person arrested.

The undisputed evidence in this case shows that the officers were called to the *Spectrum* offices to investigate a complaint that a gentleman would not leave when requested to do so. While discussing the incident with Bergquist, another student informed the officers that a man fitting the description of the one they were seeking was in the SOTA lounge. The officers approached Wishnatsky, repeatedly sought his name, and asked whether he had legitimate business on campus. When Wishnatsky refused to answer, the officers informed him that NDSU had a trespass policy. They gave him a copy of the trespass policy that quoted NDCC 12.1–22–03(3), and showed him a trespass warning card that stated: "I must ask you to leave the university campus and if you refuse or return you may be arrested for trespassing." Wishnatsky still refused to give his name or explain why he was there.

On these undisputed facts, the officers could reasonably have believed that Wishnatsky refused to leave the student lounge designated for use by older-than-average students of the university after being advised he was not privileged to be there and being given notice that he was trespassing. *See* NDCC 12.1–22–03(3). Even if we assume that Willoughby and Bernd erred in concluding that there was probable cause to arrest, their decision, if mistaken, was reasonable. *See Hunter,* 502 U.S. at 228–229, 112 S.Ct. at 537. If mistaken, their conduct did not reflect plain incompetence or a knowing violation of the law. *See Hunter,* 502 U.S. at 229, 112 S.Ct. at 537; *Anderson,* 483 U.S. at 638, 107 S.Ct. at 3038; *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096. We conclude that, under these circumstances, a reasonable officer could have believed there was probable cause to arrest Wishnatsky for trespassing. Accordingly, Willoughby and Bernd are immune from suit on Wishnatsky's § 1983 claims.

### B. *Statutory Immunity*

■ Willoughby and Bernd assert that they are immune under NDCC 32–12.1–15(2) from liability on Wishnatsky's claims for false arrest. The trial court agreed, ruling that Wishnatsky had failed to plead the required level of culpability to avoid the immunity accorded to state employees under the statute.

At the time of this incident, NDCC 32–12.1–15(2) declared:

No employee of the state may be held liable in the employee's personal capacity for actions or omissions occurring within the scope of the employee's employment unless such actions or omissions constitute reckless or grossly negligent conduct, malfeasance, or willful or wanton misconduct.

Wishnatsky did not plead reckless or grossly negligent conduct, malfeasance, or willful or wanton misconduct by Willoughby or Bernd. Nor does he allege that they were not acting within the scope of their employment when they arrested him. Indeed, *Schloesser v. Larson*, 458 N.W.2d 257, 260 (N.D.1990) (*overruled on other grounds by Bulman v. Hulstrand Construction Co.*, 521 N.W.2d 632 (N.D.1994)), ruled that, when a plaintiff fails to plead a sufficient level of culpability to avoid the grant of immunity to a state employee, summary judgment dismissal is appropriate.

At the hearing on the motion for summary judgment, Wishnatsky orally moved to amend the complaint to plead gross negligence by Willoughby and Bernd. The district court did not specifically rule on the oral motion, but judgment was entered dismissing all claims. Wishnatsky asserts that the trial court erred in failing to grant his oral motion to amend. We conclude that, even if Wishnatsky had been allowed to amend his complaint to allege gross negligence by Willoughby and Bernd, summary judgment would still be appropriate on this record.

Gross negligence is defined as "the want of slight care and diligence." NDCC 1–01–17. This court has construed gross negligence to mean "no care at all, or the omission of such care which even the most inattentive and thoughtless seldom fail to make their concern, evincing a reckless temperament and lack of care, practically willful in its nature." *Schloesser*, 458 N.W.2d at 260 (quoting *Wysoski v. Collette*, 126 N.W.2d 896, 898 (N.D. 1964)); *see also Jones v. Ahlberg*, 489 N.W.2d 576, 581 (N.D.1992); *Bjerke v. Heartso*, 183 N.W.2d 496, 501 (N.D.1971). This definition controls here.

We have already concluded that a reasonable officer in the position of Willoughby and Bernd could have believed there was probable cause to arrest Wishnatsky for trespassing. If a reasonable officer could have believed that the arrest was lawful, their actions cannot constitute gross negligence. As *First Interstate Bank v. Rebarchek*, 511 N.W.2d 235, 243 (N.D.1994), explained, a trial court does not abuse its discretion by denying a requested amendment that would be futile.

We conclude that the trial court did not err in ruling that Willoughby and Bernd were statutorily immune from suit on Wishnatsky's state law claims.

## VI. MOTION TO AMEND

Wishnatsky asserts that the trial court erred in failing to grant his motion to amend the complaint to add claims under § 1983 against campus police chief Tim Lee and university counsel Rick Johnson in their individual capacities for "supervisory liability." The basis for these claims is Wishnatsky's assertion that Lee and Johnson developed and implemented the allegedly unconstitutional trespass policy. We find it unnecessary to address the merits of Wishnatsky's asserted supervisory-liability claims because this record establishes that the policy was never actually applied to Wishnatsky.

The trial court, in granting partial summary judgment, held that Wishnatsky had no standing to challenge the constitutionality of the trespass policy because he had never been issued a trespass warning card and the policy had not been applied to him. Wishnatsky did not appeal that partial summary judgment, nor otherwise challenge that determination.

The record on summary judgment demonstrates that the officers did not issue a trespass warning card to Wishnatsky. Furthermore, we have concluded that Wishnatsky has no § 1983 claim based upon his alleged false arrest because the arresting officers could have reasonably believed there was probable cause to arrest Wishnatsky for misdemeanor trespass under NDCC 12.1–22–03(3), without regard to the NDSU trespass policy.

Under these circumstances, where the alleged unconstitutional policy was not applied to Wishnatsky, he has no claim for

supervisory liability against university officials who developed and implemented the policy. As previously noted, it is not an abuse of discretion to deny a requested amendment that would be futile. *First Interstate Bank*, 511 N.W.2d at 243. We conclude that the district court did not err in failing to allow amendment of the pleadings to add supervisory-liability claims against Lee and Johnson.

## VII. CONCLUSION

We have considered the other arguments made by the parties and find them to be without merit. We affirm the summary judgment dismissing Wishnatsky's claims.

VANDE WALLE, C.J., and NEUMANN, J., concur.

BERYL J. LEVINE, J., a member of the Court when this case was heard, did not participate in this decision.

MARY MUEHLEN MARING, J., was not a member of the Court when this case was heard and did not participate in this decision.

SANDSTROM, Justice, dissenting.

When we consider the evidence and reasonable inferences in the light most favorable to Wishnatsky, as we must when summary judgment has been granted against him, this is a very troubling case. Wishnatsky, a citizen of North Dakota, was arrested while peaceably sitting in a lounge in the North Dakota State University Memorial Union during its regular hours. He was arrested for criminal trespass supposedly because he was not "privileged" to be there. Most North Dakotans would probably be shocked to be told they were not privileged to be peacefully in the public areas of a state university campus during reasonable hours. Indeed, the official mission statement of North Dakota State University, approved by the State Board of Higher Education on November 17, 1992, proclaims: "Accessible, responsive, and accountable to the people of the State, North Dakota State University fosters their economic prosperity and contributes to their overall quality of life."

Consistent with the State Board of Higher Education policy, in his inaugural address, N.D.S.U.'s new president spoke of the "collaborative efforts between town and gown" and proclaimed:

"Through well qualified professionals who complete our academic programs, to more hardy potatoes, better coatings for airplanes, fine arts exhibitions and performances and athletic contests, NDSU serves as a cultural, educational and economic engine for the citizens we serve."

Inaugural Address of President Thomas Plough, April 26, 1996.

N.D.S.U. encourages the public to visit the Memorial Union, view art in the Gallery and in collections "exhibited throughout the Memorial Union," and to make purchases in Varsity Mart, the university bookstore. Days and hours are publicly disseminated beyond the campus. *See, e.g.,* http://www.ndsu.nodak.edu/ (via Internet).

Wishnatsky went to the office of the campus newspaper, located in Memorial Union, to find out why his advertisement had not been published. He clearly conveyed his purpose to the defendant Bergquist. Wishnatsky challenged the different treatment of his advertisement because of its message—a challenge supported by the recent United States Supreme Court decision in *Capitol Sq. Review Bd. v. Pinette*, —— U.S. ——, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (public forums generally must be available on equal terms). Unhappy with Wishnatsky's challenge, Bergquist demanded Wishnatsky leave, and then called the police. After Wishnatsky left, Bergquist made sure the officers knew where to find him.

In their discovery responses, the officers gave the university's Loitering and Trespass Policy as their sole basis for responding. For demanding of Wishnatsky his name and other information, they again stated they were following the Loitering and Trespass Policy. Wishnatsky alleges, and we must take as true for this review, he was arrested for criminal trespass based on his noncompliance with the university policy.

Assuming the university policy was valid, by its own terms, it was not violated. The

"NDSU Loitering or Trespass Policy" provides:

"When a complaint is received that an individual has not indicated to building staff what business, if any, he/she intends to transact and the individual refuses to leave, officer (two whenever possible) will: [steps to be taken enumerated]."

The predicate to the policy actions is that the person has not indicated his business *and* (not *or*) refuses to leave. Wishnatsky had clearly indicated his business to Bergquist. If Bergquist falsely reported that Wishnatsky had not stated his business, he is responsible for instigating a false arrest. If Bergquist told the officers, then they could not in good faith have relied on the university policy.

The majority then disingenuously states:

"On these undisputed facts, the officers could reasonably have believed that Wishnatsky refused to leave the student lounge designated for use by older-than-average students of the university *after being advised he was not privileged to be there and being given notice that he was trespassing.*"

(Emphasis added.) The statute, however, is not violated by the person being told he was not privileged, unless the person was in fact not privileged to be there. There is nothing empowering the officers to create a lack of privilege here, except the university policy, which was not violated.

North Dakota has a long tradition of allowing members of the public on its college and university campuses. Generally, North Dakotans are privileged, on an equal basis, to be in the public areas of our campuses at times those areas are open to the public. *See* Comment: *The University and the Public: The Right of Access by Nonstudents to University Property,* 54 Cal.L.Rev. 132, 166–67 (1966). Even without a trespass policy, the colleges and universities are entitled to deal with disruption of their reasonable functioning. *See, e.g.,* N.D.C.C. §§ 12.1–08–01 (Physical obstruction of government function), and 12.1–08–02 (Preventing arrest or discharge of other duties). *See also Arnold v. State,* 853 S.W.2d 543, 545–46 (Tex.Cr.App. 1993). Disruption, if indeed there was any in this case, may not be dealt with through the use of "unbridled" authority exercised by school officials on constitutionally protected speech. *Smith v. Sheeter,* 402 F.Supp. 624, 631 (S.D.Ohio 1975); *See Grody v. Indiana,* 257 Ind. 651, 278 N.E.2d 280, 282 (1972). The University regulation must be "a means narrowly tailored to achieve the desired objective." *Board of Trustees, S.U.N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989). "The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.'" *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972).

I would reverse and remand on the causes of action against Bergquist and the arresting officers in their individual capacities.