John KRISTIANSON and Donna
Kristianson, Plaintiffs and
Appellants,

v.

FLYING J OIL & GAS, INC.,
a corporation, Defendant
and Appellee.

Civil No. 950363.

Supreme Court of North Dakota.

Sept. 3, 1996.

MESCHKE, Justice.

John and Donna Kristianson appealed from a summary judgment dismissing their tort action against Flying J Oil & Gas [Flying J] for injuries sustained by John Kristianson. Because we conclude Flying J owed no duty to Kristianson, we affirm.

Flying J owned an oil well in Dunn County, North Dakota. This particular well, as well as the surrounding formation, contained a high concentration of hydrogen sulfide [$H_2S$] gas. There were numerous signs on the well site warning that $H_2S$ gas was present.

Flying J contracted with WellTech, Inc. [WellTech], a "work over" company,[1] to perform service work on the well. WellTech replaced a pump and performed an "acid job" on the well. Acidization of a well is a technique for increasing oil flow by introducing hydrochloric acid into the well to enlarge and reopen pores in oil-bearing limestone formations. Williams & Meyers, Manual of Oil & Gas Terms 14 (8th ed. 1991). The well is then "swabbed," with the acidized fluid pumped out of the well and stored in a temporary test tank.

The level of the fluid in the test tank must be periodically measured, or "gauged." A worker climbs up a ladder attached to the side of the tank, drops a gauge resembling a tape measure into the open hatch on top of the tank, and extracts it, noting the depth of the fluid in the tank.

On March 13, 1991, John Kristianson, an employee of WellTech, was working on Flying J's well. While gauging the test tank, Kristianson was overcome by $H_2S$ gas emitting from the fluid in the tank. He fell to the ground and was seriously injured.[2]

At the time of the accident, WellTech had three thirty-minute air packs on the site. These air packs consist of a small tank hooked to a face mask, similar to scuba diving equipment. Flying J presented an affidavit from Norman Anderson, Welltech's area manager for North Dakota, stating that

Ronald A. Reichert (argued), of Reichert, Buresh, Herauf & Ficek, P.C., Dickinson, for plaintiffs and appellants.

Scott K. Porsborg (argued), of Smith Bakke Hovland & Oppegard, Bismarck, for defendant and appellee.

1. A "work over" is an operation on a producing well to restore or increase production. Williams & Meyers, Manual of Oil & Gas Terms 1380 (8th ed. 1991).

2. Kristianson received Workers Compensation benefits for his injuries.

all WellTech employees were instructed to use H$_2$S safety equipment when gauging temporary test tanks, and that John Kristianson's failure to wear one of the thirty-minute air packs when gauging the tank was in violation of company instructions. In an affidavit, John Kristianson denied being instructed to wear the thirty-minute air pack to gauge the tank, and asserted the thirty-minute air packs were "rescue" units to be used only for emergency situations.

Kristianson and his wife, Donna, sued Flying J on various theories, including negligent exercise of retained control of the work performed by WellTech. Specifically, the Kristiansons assert Flying J controlled the selection of safety equipment on site and controlled the manner of the work by its selection of an improper test tank. Flying J moved for summary judgment, arguing that it had not retained sufficient control over the manner and method of work to create a duty under the doctrine described in Section 414 of the Restatement (Second) of Torts. The trial court agreed and ordered entry of summary judgment dismissing the Kristiansons' claims against Flying J. The Kristiansons appealed.

■ Summary judgment under NDRCivP 56 is a procedure for the prompt and expeditious disposition of a controversy without trial if a party is entitled to judgment as a matter of law, if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving disputed facts would not change the result. *Lire v. Bob's Pizza Inn Restaurants, Inc.,* 541 N.W.2d 432, 433 (N.D.1995). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the party opposing summary judgment, and that party must be given the benefit of all favorable factual inferences. *Wishnatsky v. Bergquist,* 550 N.W.2d 394, 397 (N.D.1996); *American State Bank v. Sorenson,* 539 N.W.2d 59, 61 (N.D.1995). Once the moving party meets its initial burden of showing the absence of genuine issues of material fact, the opposing party may not rest upon mere allegations or denials in the pleadings, but must present admissible evidence establishing a genuine issue of material fact. *Wishnatsky,* 550 N.W.2d at 397; *Zueger v. Carlson,* 542 N.W.2d 92, 94 (N.D. 1996). As we explained in *Industrial Commission v. Wilber,* 453 N.W.2d 824, 825 (N.D. 1990), the party opposing summary judgment cannot leave to the court the chore of divining what facts are relevant and material to the claim for relief, but must draw the court's attention to relevant evidence in the record by setting out the page and line in depositions or other documents containing testimony or evidence raising a genuine issue of material fact.[3]

■ The Kristiansons argue Flying J is liable under the doctrine stated in Section 414 of the Restatement (Second) of Torts because Flying J retained control over the work of its independent contractor, WellTech. Generally, one who employs an independent contractor is not liable for the acts or omissions of the independent contractor. *Fleck v. ANG Coal Gasification Co.,* 522 N.W.2d 445, 447 (N.D.1994); *Madler v. McKenzie County,* 467 N.W.2d 709, 711 (N.D.1991). However, the doctrine summarized in Restatement Section 414 makes an employer liable when that employer retains control over the work:

**3.** The Kristiansons' brief on appeal quotes from and cites to depositions that are not included in the record on appeal. A party cannot rely on non-record "evidence" to demonstrate a genuine issue of material fact under NDRCivP 56. *See Richmond v. Haney,* 480 N.W.2d 751, 754 n. 3 (N.D.1992). It is true that, since March 1, 1986, when NDRCivP 5(d)(1) was amended, the rules have directed that a party may not file discovery materials with the clerk of court unless the materials are to be used for disposition of a pending motion or the court orders them to be filed. But, if a deposition or other discovery material is submitted to the trial court on a motion but not actually filed, it is nevertheless counsel's responsibility to ensure that the deposition or material is eventually filed and becomes part of the record for appeal. The rules dictate it. NDRCivP 5(d)(2) requires that "[a]ll affidavits, notices and other papers designed to be used upon the hearing of a motion ... shall be filed at least 24 hours before the hearing...." For motions where no hearing is scheduled, NDROC 3.2(a) requires that the moving party serve and file "a brief and other supporting papers," and the opposing party has 10 days to serve and file "an answer brief and other supporting papers."

Negligence in Exercising Control Retained by Employer

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

The doctrine of retained control does not make the employer vicariously liable for the independent contractor's acts, but creates an independent basis of liability for the employer's failure to exercise retained control with reasonable care. *Fleck,* 522 N.W.2d at 447–48; *Zimprich v. Broekel,* 519 N.W.2d 588, 593 (N.D.1994). As our opinions in *Fleck,* 522 N.W.2d at 447 and *Madler,* 467 N.W.2d at 711, illustrate, employees of the independent contractor fall within the purview of Section 414, and the employer of the independent contractor owes a duty to the independent contractor's employees to exercise retained control with reasonable care.

Thus, in *Fleck,* 522 N.W.2d at 448, we explained that retained-control liability arises only when the employer retains significant control over the work:

The liability created by Section 414 arises only when the employer retains the right to control the method, manner, and operative detail of the work; it is not enough that the employer merely retains the right to inspect the work or to make suggestions which need not be followed. Comment c to Section 414 explains the difference:

"In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative de-

tail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."

See also *Zimprich, supra; Madler, supra; Schlenk [v. Northwestern Bell Telephone Co.,* 329 N.W.2d 605 (N.D.1983) ].

The Kristiansons assert Flying J retained control over safety equipment at the well site. They further assert the rescue air packs were not appropriate safety equipment for gauging this tank, and Flying J should have provided a "work pack," consisting of a large air tank that sat at the base of the ladder and a long hose connected to a face mask.

■ The Kristiansons have presented no evidence that Flying J had anything to do with the selection of the thirty-minute air packs on the well site. Norman Anderson of WellTech said in his affidavit that he selected the air packs and arranged to have them on the site while WellTech's crew worked there. Although the cost of this equipment was ultimately billed to Flying J by WellTech, Flying J had no role in selecting the equipment.

Relying upon deposition testimony of Mitch Carlson, the Flying J employee in charge of North Dakota operations, the Kristiansons assert that Flying J retained ultimate control over safety equipment because it could veto expenditures for equipment. The Kristiansons have mischaracterized Carlson's testimony. Carlson testified that if WellTech had wanted unusual safety equipment, such as a safety trailer and full-time safety supervisor, he would have had to approve it. It is uncontroverted, however, that WellTech did not consult Carlson before ordering the thirty-minute air packs. We conclude that retaining the right to approve unusual or extraordinary safety expenditures did not constitute retained control over the manner, method, or operative detail of the work sufficient to create a duty by Flying J to WellTech's employees.

Furthermore, even if Flying J's retention of the right to approve expenditures did create a duty, Flying J's duty would have been only to use reasonable care in exercising that

retained control. The only control retained by Flying J was the right to approve expenditures requested by WellTech. Thus, Flying J's duty to Kristianson was to act reasonably in approving WellTech's requests for expenditures for safety equipment. The Kristiansons have presented no evidence that WellTech ever requested additional safety equipment, let alone that Flying J unreasonably denied such a request. There is no evidence that, if any duty existed, Flying J breached its duty.

The Kristiansons also assert Flying J retained control over the manner and method of the work by its selection of the temporary test tank.[4] The Kristiansons assert this was an improper tank that posed a risk for the workers who gauged it, and Flying J should have provided a tank with a stairwell, a protective cage, or a platform.

 The Kristiansons cite no authority for their assertion that merely providing an isolated piece of equipment may constitute control sufficient to create a duty under the retained-control doctrine. Cases applying the doctrine indicate merely providing equipment is not the kind of control that creates a duty. *See Jones v. Coleman Co.,* 39 F.3d 749, 754–55 (7th Cir.1994); *Thomas v. Internorth, Inc.,* 790 F.2d 1253, 1255 (5th Cir. 1986); *Downs v. A & H Construction, Ltd.,* 481 N.W.2d 520, 524–25 (Iowa 1992); *Staublein v. Dow Chemical Co.,* 885 S.W.2d 502, 505–06 (Tex.Ct.App.1994). As *Stephens v. Crown Equipment Corp.,* 22 F.3d 832, 835–36 (8th Cir.1994) and *Gulf States Utilities Co. v. Dryden,* 735 S.W.2d 263, 265–66 (Tex.Ct.App. 1987), illustrate, a duty arises only if the employer, in addition to providing the equipment, also directly supervises or controls its use, or instructs the independent contractor's employee on use of the equipment.

The *Thomas* decision is particularly illustrative. Internorth, Inc., hired Midwest Inspection Services to inspect a gas compression station. Thomas, an employee of Midwest, was injured when he fell from a ladder provided by Internorth. There was evidence Thomas had requested that Internorth provide someone to hold the ladder for him, but was told Internorth's employees were too busy. In rejecting Thomas's claim against Internorth under the retained-control doctrine, the court said:

> The evidence did not show that Internorth assumed any supervisory control over Thomas or the manner in which he did his work. The provision of a ladder to Thomas by an Internorth employee simply does not satisfy the showing of control required. If Thomas needed additional help, it was up to Midwest to furnish it or to find a safe way to do the job within its budget.

*Thomas,* 790 F.2d at 1255. Similarly, here, the evidence on the summary judgment motion does not show that Flying J assumed control over Kristianson or the manner that he did his work.

This conclusion is also supported by our decision in *Fleck.* Fleck was employed by CCT, which had been hired by ANG to replace tiles in the water cooling towers of ANG's coal gasification plant. ANG furnished face masks, slickers, boots, and gloves to CCT's employees, including Fleck. After experiencing respiratory difficulties from the work, Fleck sued ANG, alleging retained-control liability based upon ANG's providing safety equipment on the job. We rejected Fleck's claim, concluding that ANG's conduct in furnishing the safety gear was at best a suggestion or recommendation that CCT did not necessarily need to follow, because there was no evidence ANG required CCT's workers to wear the gear.

Similarly, it was WellTech's duty here to use the test tank in a safe manner or request a different tank. There is no evidence Flying J required that only this tank be used or directly supervised WellTech's use of the tank. Under these facts, Flying J's ordering and furnishing the tank did not evidence sufficient control of the manner, method, or operative detail of WellTech's work to create a duty to John Kristianson.

---

4. There is a factual dispute whether Flying J actually selected and ordered the test tank. Because the party opposing summary judgment is entitled to the benefit of all factual inferences, we assume for the sake of the summary judgment motion that Flying J ordered and selected the test tank.

Nor does the record support the Kristiansons' assertion that this was an unusually dangerous tank that posed an unreasonable risk to workers gauging the tank. John Kristianson's deposition evidenced that he had gauged similar tanks many times:

Q. Tell me what—what the whole process of gauging a tank involves. I mean what you as a roughneck would do when you're gauging a tank.

A. Well, it depends on if it's a tank battery or if it's a test tank. Tank battery usually have nice stairways you can climb up. You go up and open the hatch. You run a plumb bob on a tank gauge. Run it down 'til it just touches. And you reel it back up slowly so you can watch for—see where the gauge got wet to. And you read that number. Then you wipe the gauge off and go write down the number somewhere. And then if you're on a test tank then you have to climb a ladder. It's basically just rungs welded to the side of the tank. You climb that with your tank gauge and kind of balance on the top of the ladder and run the thing down.

Q. When do you use a test tank at a jobsite?

A. Usually if you're swabbing or if you're just—if you're just completing the tank—well. You flow it into the test tank because they won't have a tank battery built yet.

Q. And were there a number of instances in your career in the oil fields where you gauged a tank that was a temporary test tank?

A. Yeah.

Q. That was a pretty common routine task that you had to perform?

A. Yes.

* * * * * *

Q. Could you give me your best estimate as to the number of times, not the number of times you've gauged a tank, but the number of well sites while you were working at WellTech where you were involved in gauging a tank on a temporary production tank?

A. On a regular production tank?

Q. On a temporary test tank.

A. Temporary ones?

Q. Yeah.

A. Gosh, I don't know. Probably fifty.

Q. Okay. I take it that most of the time when you'd be out at a well site where there would be a need for a test tank that it would be a temporary tank that would be brought on location?

A. Right.

Q. Okay. Now the tank from which you fell in March of 1991, was that similar, if not identical, to every other temporary test tank that you had ever climbed up on to gauge?

A. Pretty similar, yeah.

Q. They all had the same—are designed in the same way with a ladder welded to the side?

A. Yeah.

Q. And the hatch right at the top of the ladder?

A. Right.

Thus, this was the customary style tank used for this procedure in the industry.

We conclude, after viewing the evidence in the light most favorable to the Kristiansons, that Flying J did not retain control over the manner, method, or operative detail of WellTech's work. Therefore, Flying J owed no duty to John Kristianson under the retained-control doctrine. Consequently, resolution of any remaining factual disputes will not change the result, and Flying J is entitled to judgment as a matter of law.

We have considered the other questions raised by the Kristiansons and find them to be without merit. We affirm the summary judgment dismissing the Kristiansons' claims.

VANDE WALLE, C.J., and SANDSTROM, NEUMANN and MARING, JJ., concur.